## W. C. BYARS v. STATE.

No. A-800.　Opinion Filed August 21, 1912.

(126 Pac. 252.)

1.　APPEAL—Review—Questions of Fact—Sufficiency of Evidence. (a) The jury are the exclusive judges of the credibility of the witnesses; and where there is nothing in the record to indicate that they were influenced by improper motives in arriving at their verdict, and where the testimony is such as to reasonably support the verdict, a conviction will not be set aside on the ground that the jury rejected the evidence for the appellant.

(b) For testimony offered by appellant which, in the opinion of the court, is unreasonable and incredible, see statement of the testimony.

2.　HOMICIDE — Indictment and Information — Review — Harmless Error—Conviction of Offense Included in Charge. (a) Where the appellant is charged with and tried for murder, and is convicted of manslaughter, objections urged to instructions given upon the question of murder will not be considered upon appeal, in the absence of a showing that the appellant was injured thereby.

(b) Where instructions upon the subject of manslaughter are more favorable to appellant than the law requires, objections to such instructions will not be considered upon appeal.

(c) A verdict of manslaughter may be rendered in a case where the information charges that the homicide was unlawfully committed with a premeditated design to effect the death of the deceased.

(Syllabus by the Court.)

*Appeal from Superior Court, Pottawatomie County; George C. Abernathy, Judge.*

W. C. Byars was convicted of manslaughter in the first degree, and his punishment assessed at imprisonment in the state penitentiary for fifteen years, and he appeals. Affirmed.

The following is a condensed statement of the material portion of the testimony:

J. I. Miller testified for the state that about the 1st of August, 1909, in Pottawatomie county, witness saw the deceased late Sunday afternoon lying on the spring seat in his wagon; that deceased appeared to be shot in the mouth; that there was blood all over his face and also on the seat and wagon.

Charles Green testified for the state: That just after sundown on the 1st of August, 1909, the team and wagon of the deceased came up to the house of witness. That witness stopped the team and found the deceased lying dead on the front seat of the wagon, shot in the mouth. That witness heard gunshots, and heard a wagon driving very fast. This was just a few minutes before the team of deceased came up to the house of witness. That witness then took the back tracks of the wagon, and about a mile from there found a gun and the hat of deceased, where the team had apparently stopped. Witness found at this place horses' tracks and men's tracks. This was on the public road. There were some trees near where the wagon was stopped. The road was sixty odd feet wide, and had a three-strand wire fence on each side. Witness found the gun under a tree south of where the wagon stopped. The gun was lying on a pile of brush. The hat of the deceased was found west of the wagon. Witness also found an empty cartridge hull ten or fifteen feet northwest of the wagon. There were some horses' tracks and men's tracks near where witness found the empty cartridge hull. It was a Winchester shotgun, with two loaded shells in the gun. These shells were loaded with No. 8 buckshot. The gun was a No. 12 shotgun. Tracks led from where the empty shell was found to the wagon, both men's tracks and horses' tracks. The ground where the empty hull was found was elevated about three feet above where the wagon stood.

Arthur Stanley testified for the state that on Sunday afternoon, the 1st of August, 1909, witness was on the place of Mr. Charles Green, and heard two shots about one-quarter of a mile west of where witness was. Witness did not hear anything else for a few minutes; then he saw a wagon coming. The wagon passed witness about fifty yards, and went to Mr. Charles Green's house. No one was driving the wagon. The deceased was in the wagon, apparently dead. Deceased was balanced across the wagon seat. Deceased appeared to be shot in the mouth.

W. M. Williams testified for the state that he went out to the house of Mr. Charles Green. That he found the deceased

lying in his wagon in front of Mr. Green's house. Deceased was dead. He appeared to be shot in the mouth. The front of the wagon where deceased was was covered with blood. Witness, in company with other persons, went up the road in the direction the team had come from, and went south about a mile and west about a quarter, and found the place where there had apparently been a scuffle in the road. That they found a lot of horses' tracks and men's tracks. They also found a gun eighteen or twenty feet from the road on the south side of the road, where the wagon had stood. The gun had one load in the barrel and two in the magazine. They also found a hat about twenty feet from the gun on the southwest side of the road. Witness noticed tracks leading from where the wagon stood going in the direction of the town of Byars, and followed these tracks to Byars.

It was admitted that Dr. Burfield had testified in the preliminary trial of appellant, and had since died.

Hal Johnson, being sworn, testified for the state: That he was justice of the peace and resided in Shawnee, Pottawatomie county, Okla. Witness was also a stenographer. That he was present at the preliminary trial of appellant and took the testimony in the case. That Dr. Burfield testified at said trial. That appellant was present and represented by counsel, who cross-examined the witness Burfield. That on said trial said Burfield testified that he resided at Byars, and was constable there. That on the night of the killing witness saw the appellant, Will Byars, and arrested him on the charge of being implicated in the murder of deceased. That appellant rode up to the house of witness and called him, and said:

" 'I suppose you have heard of Snapp being shot?' I says: 'No; what time?' I says. He says: 'Tonight.' Then he went on and told me. He says: 'Hawk Jones, Pat Ellis, John Rudell, and myself, we all went down.' And I asked him what they went for, and he said to get some beer, and when they got down there that Mr. Snapp had left the ford, and was on his road home; and he said: 'We overtook him, and when we overtook him in the lane, about three-quarters of a mile from the ford, and John Rudell rode up on the left side and got

off his horse, and Pat Ellis rode up on the right-hand side.' And that him and Hawk Jones was back in the rear somewhere. He said John Rudell picked up the shotgun, and said, 'Will this thing shoot?' and pointed it at Snapp, and it went off. And I asked him then what was doing on the other side, and he said that Pat was off his horse, but didn't think that Pat was doing anything. And I examined him further, and asked what he had done with the gun. 'When the gun fired,' he said, 'Snapp fell over on the spring seat, and the team started off in a trot;' and that Pat Ellis followed the team down the road, perhaps two or three hundred yards, or something like that—I believe the remark was two or three. I asked him, 'What did Ellis say when he came back?' He said, 'He said he was asleep or drunk,' and I says, 'What did you do then?' And he says, 'We rode back home.' 'What did you do with the gun?' I says. He said: 'Rudell threw the gun on a brush pile, and we came on home.' I says, 'What time was this?' He says: 'It was about dark, or maybe a little after dark.' And I says, 'Where did you go to then?' And he says, 'We came to Johnsonville and ate some ice cream there and rested a little bit; and I left Pat Ellis and Hawk Jones there and came on to town, me and Rudell.' 'Then what?' I says. He says: 'I went home and went to bed and couldn't sleep; got to studying over this matter; and Mamma told me I had better come up and tell you just what I knew about it,' he says."

George H. Layton, being sworn, testified: That he was city marshal of the town of Wanette, and knew the deceased when he was living. That between eight and nine o'clock on Sunday night, the 1st of August, 1909, witness went to the house of Mr. Charles Green, in Pottawatomie county, and there he found the deceased dead on his wagon seat. That witness then went to Byars, in McClain county, to see if he could find the person who had killed deceased. Witness returned, bringing with him Will Byars, Pat Ellis, Hawk Jones, and John Rudell. That on the way back appellant said to witness: "I can't see what caused that fellow to want to shoot that fellow. I think it was an accident."

J. P. Hawkins testified for the state that he lived near the road which led from Johnsonville to the place where the deceased was killed, in McClain county, Okla.; that on Sun-

day afternoon, the 1st day of August, 1909, appellant, Will Byars, and Pat Ellis passed the house of witness traveling east toward the place where Snapp was killed; that after dark on the same night three or four men on horseback passed the house of witness going west, and they traveled pretty fast.

Claud Hankins testified for the state: That he resided two miles north of Byars and about one-half mile north of Johnsonville. That the road from Johnsonville to the place where deceased was killed leads past the house of witness. That on the evening of the killing witness saw Hawk Jones, John Rudell, Pat Ellis, and appellant, Byars, pass the house of witness traveling northeast in the direction of the place where Snapp was killed. Hawk Jones and Rudell passed about 4 o'clock. Pat Ellis and appellant, Byars, passed about sundown. These parties came back about dark. Witness saw them all. They were riding rapidly; their horses being in a run. They were running as fast as they could. Witness was standing on his porch and saw them when they passed.

Tom Cummings testified for the state that witness saw the body of deceased lying in his wagon seat in front of the house of Mr. Green about 9 o'clock at night. Witness assisted in washing and dressing the body. Deceased was shot right in the mouth. Deceased had a moustache, but it was not powder burned.

Mark Thompson testified for the state that on the night of the homicide, in company with his brother, John Thompson, he heard some parties coming from the direction of the place where the deceased was killed, and they were riding their horses as fast as they could run. These parties passed within twenty feet of witness. They were Will Byars, —— Rudell, Hawk Jones, and Pat Ellis. They were talking loudly to each other, and they passed by where witness was. One of them said, "I wish we had got his pocketbook." Another one said, "Didn't you get his whisky?" The man said this was the hind one. It was Will Byars, the appellant, who said, "Why didn't you get his pocketbook?" Witness did not understand what answer

was made to this. Witness is acquainted with all of these parties. Witness lives about a mile from where the killing occurred.

John Thompson testified for the state: That he lived on the road leading from the place where the deceased was killed, in Pottawatomie county, to the town of Johnsonville, in McClain county. That between sundown and dark on the evening when the deceased was killed he heard some persons riding their horses, apparently going in the direction of where deceased was killed from the town of Johnsonville. That witness was standing at his kitchen door. That Will Byars, Hawk Jones, Pat Ellis, and John Rudell passed, traveling on the road going to Johnsonville. That they were riding as fast as their horses could run. That as they passed where witness was he heard one of them say, "Why didn't you get the son of a bitch's pocketbook and whisky?" Witness could not swear which one said this. That they passed within thirty feet of where witness was standing.

George Hankins testified for the state that he resided about three miles northeast of the town of Byars, in McClain county, Okla., near where the South Canadian river runs between McClain county and Pottawatomie county; that he remembered the occasion when the deceased was killed; that a little while before sundown on that day he saw appellant and some one else, whom he did not recognize, traveling on the road going in the direction of the place where deceased was killed; that just before dark he saw four men on horseback coming from the direction of the place where deceased was killed traveling pretty fast.

A. Y. Rollow, being sworn, testified that he lived in the town of Byars, in McClain county, Okla.; that he kept a hotel there; that on the evening when the deceased was killed, appellant, Byars, came to the hotel and inquired for Pat Ellis, who boarded at the hotel; that he heard appellant, Byars, say to Ellis that he was going to prize up a little hell, or something like that; that Ellis and appellant, Byars, left the hotel of Byars a little before sundown.

Tom McCall testified for the state that he lived near Wanette, in Pottawatomie county, Okla.; that witness heard of the death of deceased; that he went to Mr. Green's house, where the wagon of deceased was, and found deceased dead in his wagon bed; that ten or twenty minutes before learning of the death of deceased he heard some shooting coming from the direction of the place where they found that the killing had occurred.

O. W. Cottrell testified that he assisted in preparing deceased for burial after his death; that deceased was shot in the mouth, and his neck was broken.

J. A. Rickstrater testified for the state: That he resided in Wanette, Okla.; that he was acquainted with deceased and assisted in preparing deceased for burial; that deceased was shot in the mouth, and his neck was apparently broken.

Mrs. M. V. Snapp testified: That she was the wife of the deceased. That she last saw him alive about 8 o'clock on Sunday morning. He then left the house, driving a small light wagon. He took with him his gun, a water cooler, his dinner bucket and water jug. He put the gun in the back of the wagon. Witness never saw her husband again until after midnight. He was dead. He was shot in the mouth.

Charlie Green testified for the state: That the wagon used by the deceased was a small wagon. The bed of the wagon was about fourteen inches deep. That it had in it an ordinary spring seat. That the back of the seat was about ten inches high in the center and six inches high at the ends. That deceased weighed about two hundred pounds, and was about six feet tall.

It was proven upon the part of the state that the deceased was a whisky peddler, and that some time before the homicide the deceased had refused credit to Hawk Jones for whisky, upon the ground that said Jones was then in debt to him for whisky purchased in the past.

John Rudell testified for appellant: That he was acquainted with appellant, Pat Ellis, and Hawk Jones. That wit-

ness resided in Texas, and had only been in the town of Byars a few days before the homicide. That witness had purchased whisky and beer from deceased on two occasions previous to the homicide. That deceased carried his beer and whisky in a small wagon. That beer was kept in a water cooler with ice. That witness and some other parties had been buying beer and whisky from the deceased on Sunday, August 1, 1909, and had started back to McClain county, when he met appellant, Will Byars, and Pat Ellis about sundown, about three-quarters of a mile from where they left deceased. That they all took a drink. That appellant, Byars, and Pat Ellis requested witness to go back with them and get some more beer. Hawk Jones and witness then went with appellant and Ellis back to where deceased's wagon was. That when they got there his wagon had left. The parties then decided to overtake him, as he could not have gone far. Witness had had seven or eight bottles of beer that day and a drink of whisky. The parties were riding in a lope, and overtook the deceased traveling in a wagon. The deceased stopped the wagon and wrapped the lines around the brake. Pat Ellis and appellant, Byars, were in front, and got to the wagon first. Appellant rode to the north side of the wagon and stopped opposite the front wheel. Hawk Jones stopped at the rear of the wagon. Witness stopped about the center of the wagon and got off of his horse. Witness had no angry feeling toward deceased, and deceased had no angry feeling toward witness. Witness did not owe deceased anything. When the parties got up to the wagon of deceased, Pat Ellis said, "Hello." Witness then testified as follows:

"Q. Then what did he say? A. He said, 'Give me four bottles of beer.' Q. What, if anything, did Mr. Snapp say? A. He said something; I didn't hear it. Q. Where were you? A. On the other side of the wagon getting off my horse. Q. Did you get off your horse? A. Yes, sir. Q. Where did you leave your horse? Did you tie it, or what did you do? A. I dropped the reins on the ground; I left him standing there. Q. Where was Will Byars from you? A. At the front side of the wagon. Q. Where was Hawk Jones? A. At the rear of

the wagon. Q. And where was Pat Ellis? A. On the opposite side. Q. Was Pat off his horse? A. No, sir. Q. And was Hawk Jones on his horse? A. Yes, sir. Q. What, if anything, did you see in that wagon? A. I saw a water cooler covered up with a wagon sheet, I suppose, and I saw the gun and some sacks. Q. Where was the water cooler? A. In the center and towards the back. Q. Did you see any bottles in the sacks in there? A. Yes, sir; some sacks. Q. Did you see anything in the way of a gun in that wagon? A. Yes, sir. Q. Where was that? A. Leaning against the water cooler. Q. Leaning against it in this position, or laying up against it? A. It was up against it. Q. Which direction was it pointing? A. To the south and back of the wagon. Q. Then you think the gun pointed this way? A. Yes, sir; to the back and to the south. Q. Where was the stock of the gun? A. It was in the wagon bed. Q. Was there anything else in the wagon, except what you spoke of and the gun? A. Some sacks. Q. What did you do? A. I walked up to the wagon and caught hold of the gun, intending to pick it up. Q. Where did you take hold of the gun? A. In the center. Q. Did you take hold of the trigger? A. No, sir. Q. What was your intention when you picked up the gun? A. I just wanted to look at it. Q. Just a matter of curiosity? A. Yes, sir. Q. What did you do with it as you picked it up, or what did you intend to do? A. To bring it out to me and look at it. Q. And it pointed this way? A. Yes, sir. Q. And you took it in your right hand? A. Yes, sir. Q. How did you start to take it to you? A. My elbow was on the back wheel, and I caught it up in my hand and turned it over, and — Q. What happened when you got it off the bottom of the wagon bed? A. As I was turning the gun over it went off. Q. Do you know what caused it to go off? A. No, sir. Q. Did you point it at Mr. Snapp? A. No, sir. Q. Did you have any hostile feeling toward him? A. Not a bit in the world; no, sir. Q. Did it go off after or before you put your left hand on it? A. Before. Q. At the instant the gun was fired, where was Pat Ellis? A. On the opposite side of the wagon. Q. Where was Hawk Jones? A. At the rear of the wagon. Q. Were they on their horses? A. Both of them; yes, sir. Q. Where was Willie Byars? A. At the front of the wagon. Q. What was he doing? A. I don't know. Q. You didn't notice him? A. No, sir. Q. How far was Pat from you? A. A few feet. Q. Where was Hawk from you? A. At the rear of the wagon. Q. How far was Mr. Snapp from you? A. He was on the spring seat. Q. What was he

doing when the gun was fired? A. Sitting on the seat with his leg thrown over the seat looking back; his head was turned to the north. Q. That was after Pat Ellis had given him the dollar? A. Yes, sir; whatever it was he had given him. Q. Did he turn in the seat? A. Yes, sir. Q. And he was facing which direction? A. To the north and northwest. Q. That would be in the direction in which you stood? A. Yes, sir. Q. Did you get your left hand on the gun before it was discharged? A. Yes, sir. Q. When the gun was discharged, what did you do? A. I jumped back, the team lunged, and I jumped back and grabbed the gun with my other hand. Q. Did it jar you? A. Yes, sir. Q. Who did you next see after that? A. Hawk Jones. Q. What did Mr. Snapp's team do? A. They run. Q. Where did you see Hawk Jones? A. He came to me up at the side of the wagon. Q. What did Will Byars do? A. His horse was cutting up, and I never paid no attention to him; I saw his horse going backwards. Q. What did Pat Ellis do? A. He turned and followed the wagon. Q. What did Hawk Jones say, or what did you say to him, when he came to you? A. He said, 'What's the matter with that?' and he took the gun out of my hand, and said: 'Go catch your horse; he's going off.' Q. What did you do? A. I went and caught my horse. Q. Where was your horse? A. Going down the road a short ways. Q. Running or walking? A. He was walking when I got to him; the reins dragging on the ground. Q. What did Hawk Jones do with the gun while you was gone for your horse? A. I don't know. Q. Did you fire it again? A. No, sir. Q. How far did you go after your horse? A. Just a short ways. Q. Did you see Mr. Snapp after that? A. No, sir. Q. You went after your horse? A. Yes, sir. Q. What did Mr. Snapp's team do at the instant the gun fired? A. The team jumped and ran. Q. John, when you got your horse, what did you do? A. I came back where Hawk was. Q. Where was Hawk? A. Standing about where the wagon stood. Q. Did you have any conversation with him there? A. Yes, sir. Q. What was it? A. I asked him what he was going to do with the gun, carry it on or not; and I told him I guess we had better take it, and he said, 'No;' we would lay it out there, and if Mr. Snapp didn't get it we would tell him where it was. Q. Where did you put the gun? A. On the side of the road on some bushes. Q. How far was that from where the wagon had stood? A. Just a few feet; I don't remember how far. Q. Did you know Mr. Snapp was hurt? A. I did not. Q. How long after that was it before you saw Pat Ellis? A. A few minutes. Q. Where

did Pat come from? A. From where the wagon had stood. Q. Did you say anything to him? A. Yes, sir; I said, 'Is there anything hurt?' Q. What did Pat say? A. He said: 'Hell, no; nothing hurt.' Q. And what did you boys do then? A. We went back to Johnsonville. * * * Q. Had Will Byars had anything to do with that gun that day? A. Not that I saw; no, sir. Q. Did Will Byars touch that gun. A. No, sir; I don't think he did. Q. Did Hawk Jones touch that gun? A. Yes, sir. Q. Did Pat Ellis touch the gun? A. No, sir. Q. Was there any conversation between you boys, prior to this time. concerning Mr. Snapp? A. No, sir. Q. Was there any feeling of hostility mentioned by either one of you? A. No, sir. Q. Did you intend, when you went over there, to kill him? A. No, sir. Q. Did you ever intend to kill him. A. No, sir."

Pat Ellis, being sworn, testified for the defendant: That he had known the deceased for about a week before his death, and had never had any angry feeling toward him. That appellant, Byars, came to the hotel where witness was eating supper the evening of the killing, and asked if witness wanted to ride around with him a while. Witness replied he didn't care. Witness and appellant met John Rudell and Hawk Jones, and it was suggested that they go to Snapp's wagon and buy some whisky and beer, and they all went together. They went to where the wagon had been standing, and it was gone, and they decided it couldn't have gone very far, and they would' catch up with it. They overtook the wagon. This witness gave substantially the same account of the shooting as testified to by the witness John Rudell.

Hawk Jones testified for appellant. His testimony was substantially the same as that of Rudell and Ellis.

George H. Layton testified for the state in rebuttal that on the night of the homicide he heard Hawk Jones state that when the gun went off it was in Pat Ellis' hands. .

*Carr & Field,* and *Moman Pruiett,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., and *C. P. Holt,* Co. Atty., and *Hunter Johnson,* Asst. Co. Atty., for the State.

FURMAN, P. J. (after stating the facts as above.) First. Counsel for appellant with great earnestness insist that the

verdict of the jury is contrary to the evidence. If the state was bound by the evidence offered by the appellant, and if nothing else could be considered, this contention would be correct, and the killing would not be more than a mere misadventure. But when we come to consider all of the evidence in the record, we think that the testimony offered by appellant is not only unreasonable, but that it is absolutely incredible.

The first witness for appellant, John Rudell, claimed that the gun was in his hands when the fatal shot was fired, and he testified that when he reached for the gun he was standing at the side of the middle of the wagon, between the first and hind wheels; that his right elbow was on the hind wheel; that as he turned the gun over, getting it off of the bottom of the bed, the gun was discharged, and he does not know how it came to be fired. He also testified that the deceased was sitting on the front seat of the wagon bed, and was looking backward. The deceased was shot in the mouth. The shot went directly backward and broke his neck. If the gun was fired, as Rudell says, just as he was getting the gun off of the bottom of the wagon, the shot, after entering the mouth of the deceased, would not have gone back and broken the neck, but would have torn out the roof of his mouth and penetrated his brain, because the mouth of deceased must have been several feet above the muzzle of the gun when it was fired, if Rudell's statement was true. There is no proof that any shot took this direction. The fact that the shot went back through his mouth and broke his neck shows that the gun must have been on a level with the mouth of the deceased when it was fired, which would have been above the bottom of the wagon bed. This is not a matter of expert testimony, but something that is within the experience and knowledge of all men. Rudell's statement as to how the gun came to be discharged is contradicted by the statement made by appellant to Dr. Burfield in Byars; for appellant said that Rudell picked up the gun and pointed it at deceased before it was fired. If the deceased was sitting in the spring seat on the wagon bed looking back-

ward when he received the fatal shot, every one knows that a spring seat of a wagon is over and a little behind the axle of the front wheels; and if the witness was standing between the first and hind wheels the muzzle of the gun when it was discharged must have been within a few inches of the face of the deceased. Under these conditions, the face of the deceased would have been powder burned, yet there were no powder-burned spots found on his face or moustache. If the gun was in the middle of the wagon, and was pointing toward the rear of the wagon, as was testified to by appellant's witnesses, and was accidentally discharged as they contend, how was it possible for the shot, after leaving the muzzle of the gun, to turn back and strike deceased in the mouth; deceased being in the front part of the wagon? This destroys the testimony of appellant, and stamps it as being a fabrication. The testimony of appellant is that only one shot was fired, yet the state's witnesses testified that they heard two shots. The gun was a Winchester pump shotgun. If the killing was the result of an accidental shot, how does it happen that an empty cartridge was found some fifteen feet from where the wagon stood, and that a loaded cartridge was found in the barrel of the gun? These facts entirely destroy the credibility of the testimony for appellant. They conclusively show that the shooting did not occur as testified to by his witnesses. Because witnesses may have testified to a statement does not necessarily establish the truthfulness of such testimony. The Roman soldiers swore that while they were asleep the disciples came and stole the body of Christ. This evidence impeached itself, because it would be impossible for them to know what became of the body of Christ, if they were asleep.

It is equally impossible to reconcile the evidence of appellant with the indisputable facts in this case, and we think the jury was entirely justifiable in rejecting the testimony for appellant. The testimony of the state is strongly suggestive of the guilt of appellant, and we think would have warranted a conviction for murder. It is utterly immaterial as to who fired

the fatal shot, when the parties are all acting together. The conduct of appellant and those acting with him at the time of the killing indicates conscious guilt. It is hard to believe that innocent men would have conducted themselves in this manner. Appellant cannot say that they acted in ignorance of the fact that deceased had been shot, because he was the first person who announced this fact at the town of Byars, and because he stated that the gun was pointed at deceased when it was fired. The language testified to as having been used by appellant when he was riding his horse away from the scene of the homicide cannot be explained consistently with his innocence. The truthfulness of this testimony was for the jury to determine. The fact that the testimony introduced by appellant is manifestly untrue is also a strong circumstance against him. If a mistake was made by the jury, it was in finding appellant guilty of manslaughter, instead of murder. The jury having found that the testimony for the state was true and the testimony for appellant was false, we cannot say that their verdict is contrary to the evidence. The universal rule of this court is that, whenever there is any evidence in the record from which the jury could legitimately draw the conclusion of the appellant's guilt, the verdict will not be disturbed upon the ground that it is contrary to the evidence.

Second. The next proposition submitted by counsel for appellant is in the following language:

"The indictment in this case is drawn under the first subdivision of our statute, and charges that Will Byars murdered Snapp without authority of law, and with a premeditated design to effect the same. Had the murder been committed under any of the other subdivisions, the question of the premeditated design would have cut no figure in the case, and the state would not have been required to prove the same, either by direct or inferential evidence. The statute has drawn these distinctions, and we believe the courts will require the pleadings in cases of this character to conform to the reasonable rule that the defendant shall be informed of the charge that is lodged against him."

Among other things, the court instructed the jury as follows:

"You are instructed that, if from the evidence you find, beyond a reasonable doubt, that the defendants named in the indictment entered into a common design to seize and take from the deceased any intoxicating liquors or other property, and in the carrying out of said common design one of such persons fired the shot that killed the deceased, Hampton Snapp, and if you further find from the evidence, beyond a reasonable doubt, that it was a part of the common design between all of said persons to take such property or intoxicating liquors by force from the presence of Hampton Snapp, against his will and by means of placing said Snapp in fear of unlawful and immediate injury to his person or property, then, if you should further find from the evidence, beyond a reasonable doubt, that all such persons were acting together, and trying to take such intoxicating liquors or other property with such intention, and under such circumstances, and one of such persons fired a gun at the said Hampton Snapp, then you should find the defendant, Will Byars, guilty of murder; and, unless you so find that such common design was formed, and the defendant was a party in such design and aided or abetted same, you should find the defendant not guilty, as instructed in this instruction. * * *

"Gentlemen of the jury, you are instructed that if you find from the evidence, beyond a reasonable doubt, that the defendant, Will Byars, and the other persons named in the indictment, entered into an agreement to take and carry away intoxicating liquor or other property from the deceased, but not by force, as set forth in the preceding instruction, but with the felonious intent of appropriating it to their own use, and of depriving the deceased thereof against his will, then, if you should find from the evidence, beyond a reasonable doubt, that in the taking of such property with such intent one of such persons accidentally discharged said gun, which inflicted a mortal wound upon the said Snapp, from which he died, as alleged in the indictment, then, if you find that the defendant was present and aiding and abetting in the execution of such design, you should find him guilty of manslaughter in the first degree; and, unless you so find that such an agreement was made, and that the defendant, Will Byars, was a party thereto, and was aiding or abetting the same, your verdict should be not guilty, as hereinabove instructed."

Our statutes upon the subject of murder and manslaughter are as follows:

"Sec. 2268, Comp. Laws 1909. Homicide is murder in the following cases: 1. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being. 2. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual. 3. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

"Sec. 2276. Homicide is manslaughter in the first degree in the following cases: 1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor. 2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, unless it is committed under such circumstances as constitute excusable or justifiable homicide. 3. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such an attempt shall have failed."

The fact that appellant was not convicted of murder eliminates from the case and renders it unnecessary to discuss the objections made to the instructions given upon the subject of murder, in the absence of a showing that appellant was injured thereby. *Morgan v. Territory*, 16 Okla. 530, 85 Pac. 718. Even if appellant had been convicted of murder, the instruction given would not have been erroneous. See *Holmes v. State*, 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300. We think that the instructions upon the subject of manslaughter are more favorable to appellant than the law provides. Under the circumstances mentioned in the instruction, such taking might have been a felony, and in that event the killing would have been murder. But it is not necessary to discuss this question, because, as it inured to the benefit of appellant, he cannot be heard to complain thereat. But it is insisted by counsel for appellant that a conviction cannot be had for manslaughter, where the indictment or information charges that the homicide was unlawfully committed with a premeditated design to effect the death of the deceased.

This question has long since been settled adversely to the contention of counsel for appellant. It was first passed upon in the case of *Tom Jones v. Territory*, 4 Okla. 45, 43 Pac. 1072. Judge Burford, speaking for the court, there said:

"The appellant, Tom Jones, was prosecuted in the district court of Payne county for the crime of murder, tried by a jury and convicted of manslaughter in the first degree, and sentenced to fifty years in the territorial penitentiary at Lansing, Kansas. He brings the case to this court upon certified copies of the indictment and journal entries embracing the trial, verdict of the jury, judgment, and sentence of the court. No other parts of the record or proceedings of the trial court are before this court.

"The assignment of error contains thirteen alleged errors. The first of which is as follows: 'The verdict of the jury finds the defendant guilty of two offenses, both of murder and manslaughter in the first degree.' The verdict as set out in the journal entry is as follows: 'Territory of Oklahoma v. Tom Jones. Verdict of Jury. We, the jury, in the above-entitled cause, do upon our oaths find the defendant guilty in manner and form as charged in the indictment of manslaughter in the first degree. N. S. Davis, Foreman.' There is no merit in the contention that this verdict finds the defendant guilty of two crimes. The indictment charged murder in the usual form, and embraces within its terms the charge of manslaughter in the first degree. It was proper, on a trial of the charge of murder, for the jury to find the defendant guilty of any charge necessarily embraced within that contained in the indictment, and the jury in their verdict make certain that which they intended to do by finding the defendant guilty of manslaughter in the first degree in manner and form as charged in the indictment."

Judge Burford thought so little of the position assumed by counsel that he did not refer to the allegations of the indictment. We have examined the original record of that case now on file in the office of the clerk of this court, and find that the indictment did charge that the homicide was committed with a premeditated design to effect the death of the deceased, just as is charged in the information in this case.

This question has also been passed upon by this court in the case of *Rhea v. Territory*, 3 Okla. Cr. 230, 105 Pac. 314. This court there said:

"From this it is seen that our statute divides felonious homicides into two degrees, namely, murder and manslaughter. While in one sense they are separate and distinct crimes, yet in a broader 'sense they both involve but one offense, and that is a felonious homicide; in other words, they are simply different degrees of one and the same crime. There is therefore no necessity of including in an indictment for murder a separate count charging manslaughter; for the rule of criminal pleading is universal that an indictment for the highest degree of a crime includes all of the lower degrees of the same crime. If a.defendant is acquitted on an indictment for murder, who will contend that he can afterwards be indicted and convicted for manslaughter for the same homicide? This alone demonstrates that manslaughter is included in an indictment for murder. Every proper indictment for murder informs the defendant that he is charged with the felonious killing of a human being. This certainly gives him full notice of the nature and cause of the accusation against him. He cannot be heard to complain if he is found guilty of a lower degree of the very crime with which he is accused than that stated in the indictment.

"We could fill volumes with quotations from authorities sustaining these views. Mr. Wharton, in his great work on Homicide (section 653, on page 1043), says:, 'On an indictment for murder, the jury may find a verdict of manslaughter or of murder in the second degree; so, also, on an indictment for murder in the second degree, there can be a conviction for manslaughter. Different defendants may be convicted of different degrees, and a verdict in a prosecution for murder of guilty as charged of manslaughter is sufficiently certain to warrant a judgment, and does not find the accused guilty of two offenses. This rule applies to a verdict in a prosecution for murder of involuntary manslaughter, consisting of a killing in the commission of an unlawful act, not amounting to a felony, or of a lawful act done in an unlawful manner, or without due caution or circumspection. And a person charged with murder may be convicted of negligent homicide. And a conviction of involuntary manslaughter, consisting of the killing of a white person, though it does not apply where the involuntary manslaughter has special statutory ingredients which may be alleged, and which are not included in a general charge contained in the indictment, 'or where such manslaughter is regarded as a misdemeanor only. And a verdict for manslaughter may be returned in a prosecution for murder under a statute declaring an attempt to produce an abortion, which causes death, to be

murder, as well as in the case of an indictment for any other kind of murder."

The other propositions submitted by counsel for appellant are either not sustained by the record, or do not go to the substantial merits of the case. It is therefore not necessary to discuss them.

We have read the entire record containing over five hundred pages, and have carefully considered all of the propositions presented in the brief of counsel for appellant, and we fail to find wherein the defendant has been deprived of any substantial right to his injury. From the record it appears that appellant was fairly tried. We cannot say that the verdict is contrary to the evidence. The jury were the exclusive judges of the credibility of the witnessss, and we see nothing in the record to cause us to believe the jury were influenced by improper motives in arriving at their verdict. We therefore regard it as our duty to affirm the judgment of the trial court; and it is so ordered.

ARMSTRONG and DOYLE, JJ., concur.