## THOS. FRITZ v. STATE.

No. A-938.   Opinion Filed November 30, 1912.

(128 Pac. 170.)

1. **HOMICIDE—Perpetration of Robbery—Murder—Malice, Deliberation, and Premeditation—Presumption.**  Homicide committed in the perpetration of a robbery is murder, and in such a case malice, deliberation, and premeditated design are presumed.

2. **SAME—Robbery—Murder.**  Where, in the perpetration of a robbery, the robber takes the life of his victim, he is guilty of murder.

3. **SAME—Included Offenses.**  Where the evidence presents solely the question of murder or innocence, it is not error to refuse to instruct on the law of manslaughter.

4. **APPEAL—Jurisdiction—Reduction of Sentence.**  Under section 6955 (Comp. Laws 1909) of Criminal Procedure, this court, exercising its revisory jurisdiction, has the power to modify any judgment appealed from, in the furtherance of justice, by reducing the sentence.

5.    **SAME—Reduction of Sentence—Pardoning Power.** The power of this court to modify a judgment inflicting the death penalty for murder to imprisonment for life at hard labor when deemed proper in the furtherance of justice is not the power to commute by the chief executive of the state. The judicial power to modify a judgment and the executive power to pardon or commute are wholly distinct in their nature. The one is an award of justice. The other is an act of grace.

6.    **HOMICIDE—Murder—Sentence.** The evidence submitted upon the trial is examined and found sufficient to sustain the verdict of murder, but insufficient under the circumstances of the case to support the sentence of death, and the judgment and sentence is modified to imprisonment for life at hard labor.

(Syllabus by the Court.)

*Appeal from District Court, Muskogee County;*
*John H. King, Judge.*

Thomas Fritz was convicted of murder, and sentenced to be hanged, from which he appeals. Modified and affirmed.

This cause is here for review upon appeal from a judgment of conviction in the district court of Muskogee county, wherein the state of Oklahoma obtained a sentence of death against the plaintiff in error, Thomas Fritz.

The plaintiff in error's brief sets forth what we consider a fair abstract of the testimony as follows:

ABSTRACT OF TESTIMONY.

For the State.

H. T. Ballantine: Practicing physician; visited Walter Watson on the night of September 14th; found him injured and in a semiconscious condition; found two wounds on the skull, a large one about the center line running diagonally downward, a smaller one a little bit to the right, and a little bit smaller; wounds were on the back of the head, the large one about one and a half inch, and the smaller one about a half inch in length; death was caused by fracture of the skull. In his opinion Watson died from effects of the wounds.

Cross-examination: Wounds were not bruised around the cut; the cut was a keen cut as though made with a sharp edge; the cut was not straight, and was not ragged; wound did not

go through the skull, but went through the scalp to the bone; there was no indentation on the skull.

Thelma Morgan: Saw the defendant Thomas Fritz two or three weeks ago at Muskogee; was present when Walter Watson got hurt between Fifth and Fourth street on Columbus avenue, in Muskogee, about 10 o'clock at night; saw the defendant there; saw Walter Watson that night on Columbus avenue; was going east on Columbus avenue on the sidewalk; had seen the defendant about 15 minutes before that time on a vacant lot, going north; he was about ten steps in front of me; met Walter Watson coming from the north on Columbus avenue; he came across a vacant lot along the same path by which the defendant had gone north; met Walter Watson on Columbus avenue and talked to him; went together to a vacant lot between Fourth and Fifth street on the south side of the street; there were a number of wire spools on the lot, about as tall as I am; went about 40 feet across the lot; Sadie King was with me; we left her standing on the sidewalk; saw the defendant walk up and throw two stones while Walter Watson and I were lying down; he was on top of me; Watson's head was on the left side of my shoulder, and my face was facing east, and his face was facing west; his face was on the left side of my face; we were in that position when he was struck; did not see him when he first came up; was about 10 feet away when I first saw him; when I first realized that he was there, he had hit Walter Watson with a stone; threw another stone and hit him again, then he hit me on my left arm; Walter Watson fell over on my right shoulder and groaned; the defendant came up and jerked me out from under Watson; then he searched my stockings and my privates, and said, "I am going to stop you nigger bitches fooling around with white men," caught hold of my neck, and turned my head to the south, told me to get up, and I got up about ten feet from them, and he says, "Don't you run;" then saw him go into Watson's left hip pocket and then told me, "You can go, you black bitch;" I went to the sidewalk where Sadie was; there was an electric light in the middle of the alley; did not see the defendant any more that night; did not know that Walter Watson had been hurt until a

day or two afterwards; next saw the defendant on a Saturday night.

Cross-examination: My husband's name is Jeff Morgan; we were both arrested on Saturday evening and locked up; have known Sadie King for about a year or two; knew her at Oklahoma City; was arrested and found guilty in Oklahoma City at the time of raiding a house; I was living with Jeff Morgan in that house; they got him, too; saw Sadie King for the first time in Muskogee that night; met her on the street; we were working that part of town; was just walking the streets; were together when we met Walter Watson; I was walking a little in front; when he passed me I said nothing to him; he and Sadie had some words; I saw Jeff Morgan that evening; he was at the gambling house; when I get a little money, I carry it home to him at night; have been doing this for three or four years; got a dollar from Walter Watson; left Watson a little after 9 o'clock; saw Fritz just a little before we met Watson; Sadie was with me then; the place where Watson and I went was about 40 feet from the electric light; Fritz and Watson met in the vacant lot in the path; that was a different lot from the lot Watson and I went into; Watson spoke to Sadie and said he would like to see me; Sadie called me and said, "He wants to see you, girl;"I walked back to him and he paid me a dollar; we went up the road in the lot till we got to the wheels; left Sadie on the sidewalk about 40 feet away; she was there when I came back; when the trouble occurred, I screamed very loud and yelled "murder" as loud as 1 could; I yelled several times; was badly scared and kept yelling for help; we were pretty close to the spools; it was a moonlight night; when I first saw the defendant, he was standing west from us; saw him throw one stone; I did not see him pick up the stone; I only know it was a stone by the way he threw; I imagined it was a stone, but don't know whether it was a stone or not; don't know whether he threw another; just saw him when he was making the motion; did not see anything come out of his hand; could not tell what he had in his hand; could not see who the man was until after I got up; began to yell "murder" after the first blow; I think there was another blow struck;

defendant ran up on me and held me there until he searched me; I could not run because I was scared to death; defendant searched my stockings; he got no money; I left the $1.00 I got from Watson lying there; he told me to get up and stand there, and I saw him go in Watson's hip pocket and then he told me to go away; defendant had his hat pulled down over his face; I never talked with the defendant in my life; had seen him once or twice maybe; I went back to Sadie and went on down to Fourth street, and told two or three people about it, and then went home; met Jeff Morgan and went home with him; did not say anything to the officers about the matter until Saturday at the jail; when they arrested me they did not tell me what they wanted me for until we got to the jail; I told them I knew nothing about it; I told the officers if they would let me go I would find the man; I just walked up and down Sixth street; I found him out on Sixth street; Fritz asked me where I was going and said, "Do you want to make a piece of money?" and I said, "Yes," and he followed me up to the alley into a barn, then the officers came up and arrested him.

Redirect examination: Fritz as he crossed Columbus avenue going north had on a dark hat and a light pair of trousers.

Sadie King: Saw Walter Watson once; heard of his getting hurt when I was arrested; the first time I saw him was on the 15th, Wednesday night; I was on Columbus avenue between Fourth and Sixth with Thelma Morgan, going west on the north side of the street; we met Walter Watson; he was going southeast, coming from the direction of Fourth street; I had not seen Fritz any time that night; Watson said "Good evening" to me, and said he wanted to see the little girl; she was two or three steps ahead of me; I called her and she turned around and went on with him across the street south and went down the alley toward the railroad track; I walked up Columbus avenue about 40 yards and stood on the south side of the street, waiting; there was an electric light about 40 yards from the alley; I saw them as they went down the alley until they got out of sight behind some big wooden wheels; I saw a colored man go down the alley; he had on a light pair of pants and a light hat or dark;

it was a soft hat; I was about 10 or 15 feet away when I saw him; could not say that the defendant was the man that I saw; he was about the same size, but I paid no particular attention to him; he went down the same path that Thelma and Watson went; I paid no attention to him after he turned off Columbus avenue; the next person I saw was Thelma, who came running out; Watson was not with her; I heard no talk nor any noise of any kind while she was over there with Watson and before she came back to me; 'they were about 40 yards from me.

Cross-examination: I did not know Thelma before I came here; I knew of her; just only spoke to her; saw her in Oklahoma City; I came from Wichita, Kan., on the day that this thing occurred; my husband came with me; I hustle when I get pay for it; don't hustle for a living, but when a man wants to spend a dollar with me, I take it; saw Thelma first that night; the colored man that I saw went in there about five minutes after Thelma and Watson had gone; I did not watch him as he went down the road; if he turned in among the spools, he had to go west; the spools are on the west side of the road; would not say what was the shape of the hat he wore, but it was a light hat; I could tell it was not a black hat; I don't remember testifying at the preliminary hearing that he had on a black hat; Thelma was gone over there in the yard about 15 minutes before she came back; I was standing waiting for her; saw no one but that one man; after she came out we went straight on down Fourth street home; I left her standing after we crossed the railroad track; she met her husband there and I went on home; I have never been in jail any length of time until they got me here; they would just take me down and I would pay my fine and get out.

H. H. Brown, county jailer: When Fritz was brought to jail, we searched him and found on his person a purse and a watch chain; there were some pawn tickets in the purse; one of the pawn tickets was on T. Miller and the other one on the Toggery; the pocketbook was from the Muskogee National Bank; in the pocketbook was the watch chain and pawn tickets (the pawn tickets were here offered in evidence); I went to T. Miller's and presented the pawn ticket, and received a watch and the ticket

stub (the stub was here introduced in evidence) ; the pocketbook, chain, and watch have been in my possession.

Joe Depew, deputy sheriff: Arrested defendant; he told me where he lived, and I searched the house and the room he occupied; I found several pairs of pants and some old coats; I took charge of one pair of pants and a hat, a light hat. (Pants are here introduced in evidence by the state.)

T. Miller: Knew Watson; I sold him a watch along about last December, a No. 12 size, 15-jewel, 20-year crown case, open face, gold watch; I gave him a chain with the watch; I heard of Walter Watson getting hurt; I have had business with the defendant, but I could not tell positively; I think it was this defendant brought in a watch, and I made him a loan on it about 5 o'clock on the evening of the Saturday following Watson's death; it was the same kind of a watch I sold Watson; I gave the watch to H. H. Brown, county jailer; he had a ticket calling for the watch; it looks exactly like the watch I sold Watson; it is the same watch that I got from the colored man; the chain was the chain that I gave Walter Watson at the time I sold him the watch.

George W. Gullick: I am a jeweler; work for T. Miller; I knew Walter Watson; he bought a watch from Mr. Miller and got a watch chain; I put a toggle chain on it to hang a $10 gold piece some time after Christmas. (Witness identifies the chain introduced in evidence as the one referred to.)

Lee Smith: Saw the defendant at my place on the corner of North Fourth on Thursday after Watson's death; I heard Wednesday night that this man had been killed, and it was on Thursday that the defendant came to my place; he had a $10 gold piece; he wanted to change it; we did not change it, as I thought there was something wrong about it; I read about Walter Watson being killed in the paper; I can swear absolutely that the defendant came to my place on Thursday, and I had read in the paper of Watson being murdered before that time.

Paul Rial, proprietor of the store where Watson worked, testified that the purse and pocketbook in evidence were similar to those carried by Watson; offered a reward of $250 in the case.

John Pascal: Defendant and I roomed together on North Ninth street; did not hear of Walter Watson being hurt on Wednesday night; work in a restaurant, and was there until 9 o'clock that night, then went home; Fritz was not there; went to bed between 9 o'clock and 10 o'clock; Fritz was there in the morning.

Cross-examination: Briggs, the owner of the house, went home with me that night; we went in at the door on the back porch; Briggs went to his room and I went to mine; neither of us went to the front of the house.

Eva Briggs: Have known the defendant Fritz for about a year; he roomed at my house.

It was agreed that the first paper giving an account of Watson's murder was not issued before 4 o'clock p. m. Thursday, September 15th.

### For the Defense.

Thomas Fritz: I am 25 years old; have lived in Muskogee since October, 1905; I was not on Columbus avenue between Fourth and Sixth streets on the night of September 14th, I have seen Thelma Morgan, but do not know her personally; I don't know Sadie King; I have seen Walter Watson in his lifetime; I did not hit Walter Watson; I was not in that neighborhood anywhere that night; I was at 412 North Ninth street, at the house of Mrs. J. A. Briggs, where I room; went home about 6:30, had a bad cold, and got Mrs. Briggs to give me some medicine; laid down in the room awhile, then went on the front porch for about a half hour, and got a pillow; then I lay down under the shade of the vines on the front porch until about 9:30, and from there I got up and went to bed; John Pascal occupied the room with me; he was in bed when I went up at 9:30; I saw the watch and chain introduced in evidence; I got them from a man that gave me his name as Tom Williams, and afterwards I learned it was Jeff Morgan; I have seen him two or three times, but don't know him personally; he came to me and asked me to let him have $4 on his watch, and that he would redeem it Saturday, and give me $5 for it; I let him have the money; that was

Thursday evening, September 15th; the watch had a chain on it, but no locket; I saw this man about 2 o'clock on Friday after that; he said he was just looking for. me; that he wanted to redeem his watch, and offered me a $10 gold piece; I did not have the change; I owed Prof. Woods a dollar, and he did not have the change, and we went to the First National Bank to have it changed; the first place we tried to get it changed was a place on North Fourth street; I don't know whether Lee Smith is the proprietor; but Jeff Morgan and I went to the bank; when we got it changed, he asked me if I really needed it that day, and I told him no, I could wait until tomorrow; he said, if he did not pay me Saturday, I could pawn it, and get my money out of it; I pawned the watch at T. Miller's and got $5 on it; the pocketbooks introduced in evidence belong to me; I got the small one at the Muskogee drug store when I was working there as porter; worked there about 18 months; I got the other one at the old Spaulding College when I cleaned up some rooms; it was among rubbish left in the room by people who had moved out; I was arrested September 17th; I was on my way to town, coming down Sixth street; met this woman Thelma Morgan, and she asked if I wanted to spend some money, and suggested that we go up the alley, and she went down Broadway and turned up sort of a vacant lot where there was an old barn; we got there just a few minutes when the officers came and arrested me; told me I was arrested for disorderly conduct; never was convicted, and was arrested only once for throwing some trash back of the store when I worked for the Muskogee Drug Company; I worked for them six months after that time.

Cross-examination: The pants introduced in evidence are mine, and also the hat; I did not wear those pants Wednesday night; I worked in them, and always change clothes when I go home. I worked Wednesday for J. C. McCullough as janitor at the Muskogee Business College, the old Spaulding College. The hole in those pants was not there when I wore them.

Earl Bohannon: Was present at the preliminary hearing, and heard Thelma Morgan swear that the hat the man had on who made the assault on Watson was a black hat.

### Rebuttal.

Eva Briggs: On the Wednesday evening when Watson was supposed to have been hurt I was at home; the defendant was there; he came home about 7; there is a front porch on my house with vines over it; I left the house about half past 7 and got back about half past 9; did not see the defendant on the front porch; he was in his room about 7 o'clock and I gave him some medicine, and a little while afterward I went to church; did not see him after that time.

Jeff Morgan: I do not know Tom Fritz; never gave Tom Fritz a watch and chain to be pawned; never told him my name was Tom Williams; never saw the watch and chain in my life; never went with Tom Fritz to the First National Bank to get change for a $10 gold piece; never gave him a $10 gold piece to get changed.

Charles A. Cook: Was a clerk for the Muskogee Drug Company in 1909 when the defendant worked there; I do not remember any occasion when the defendant found a pocketbook in a show case; I don't remember his ever calling my attention to it.

B. A. Randel, teller at First National Bank: Do not have any recollection of two colored men coming to the bank and getting change for a ten dollar gold piece flattened on one edge; if the gold piece had been cleaned off and had no peculiar mark on it, it might have been passed, and I might have changed it without noticing it; I am testifying only because I understand this gold piece had some peculiar mark on it.

C. R. Mills, bank teller in First National Bank: I do not know Tom Fritz or Jeff Morgan. I have no recollection of their coming to my window to get a ten dollar gold piece changed; I took no $10 gold piece that had any unusual mark on the edge of it; if the gold piece had no special mark on it, this negro or somebody else might have brought the $10 gold piece, and got it changed, and I might have changed such a gold piece. All I am testifying to is that, if the $10 gold piece had been handed to me with an unusual mark on it, I would probably have known it.

N. F. Hancock: Was one of the proprietors of the Muskogee Drug Company in 1909, when the defendant worked there; I do not recollect having a pocketbook like the one in evidence in stock, but my partner, Mr. McLaurin, did the buying; I would not say positively that we did not have such a book in stock, but it is my opinion that we did not.

*A. A. Davidson* and *Galen Nichols* (*C. W. Bliss* and *James Allen,* of counsel), for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). Thomas Fritz, the plaintiff in error, was tried, convicted and sentenced to be executed for the crime of murder committed upon one Walter R. Watson September 14, 1910. The information was presented and the defendant duly arraigned in the district court of Muskogee county on September 24, 1910, and was by the court given until September 28th to enter his plea thereto. September 27th, on application of the defendant, the court appointed counsel to conduct his defense. September 29th, the defendant having entered his plea of not guilty, and the state and the defendant having announced ready for trial, a jury was empaneled to try the case. October 1st the jury returned the following verdict:

"We, the jury in the above-entitled action, duly and legally empaneled and sworn upon our oaths, find the defendant guilty of murder, and assess his punishment at death."

October 3, 1910, a motion for a new trial was overruled, and the court pronounced and entered judgment and sentence in accordance with the verdict, fixing November 18, 1910, as the time for execution. From the judgment, sentence, and the order overruling motion for new trial the defendant appealed by filing in this court November 4, 1910, his petition in error with case-made attached. An order was made staying execution of sentence, and the defendant as by law provided was committed to the state penitentiary pending the determination of his appeal.

This appeal involving, as it does, the life of a human being, presents the gravest question which can occupy the attention of a

judicial tribunal. To fulfill the duty here imposed upon us, we have patiently read the evidence and examined the record with that care and deliberation which its importance to the defendant and to society demands. Counsel for plaintiff in error contend that:

"The verdict is against the law and the evidence, in that the crime proved on the trial was not murder as charged in the information, and as defined by statute, and by the court in its instructions to the jury, but which crime, if any, was manslaughter as defined by the statute."

Our Criminal Code defines murder and manslaughter as follows: Section 2268 (Compiled Laws 1909.):

"Homicide is murder in the following cases: (1) When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or any other human being. (2) When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual. (3) When perpetrated without any design to effect death by a person engaged in the commission of any felony."

Section 2269:

"A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed."

Section 2276:

"Homicide is manslaughter in the first degree in the following cases: (1) Where perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor. (2) When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide. (3) When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

The information charges the defendant with murder as defined by subdivision 1 of section 2268; that is, that the defendant committed the homicide without authority of law, with malice aforethought, and with a premeditated design to effect the death of the deceased. In the trial of the case the evidence introduced by the state disclosed that the homicide was committed by the

defendant, if committed by him at all, in the perpetration of a robbery. The third subdivision of section 2268 provides that homicide is murder when perpetrated without any design to effect death by a person engaged in the commission of any felony. Section 2269 provides that a design to effect death is inferred from the fact of the killing, unless the circumstances raise a reasonable doubt whether such design existed. In his charge to the jury the court made no reference whatever to murder as defined by subdivision 3. His instructions related wholly to the crime of murder as defined by subdivision 1 of said section 2268.

The learned counsel for the defendant contends that the evidence was insufficient to establish the premeditation and deliberation necessary to constitute murder under the first subdivision. In the case of *Holmes v. State,* 6 Okla. Cr. 541, 119 Pac. 430, Furman, Presiding Judge, speaking for a majority of the court, held that:

"Where an indictment or information charges a defendant with murder under the first subdivision of the statute, a conviction can be had, if warranted by the evidence, under and by virtue of the other subdivisions of the statute."

See also, *Turner v. State, ante,* 126 Pac. 452; *Byars v. State,* 7 Okla. Cr. 650, 126 Pac. 252. This doctrine, although severely criticized by Mr. Bishop, is sustained by ample authority. Mr. Bishop's text has application to cases from jurisdictions where murder is divided into more than one degree. 2 Bishop's Cr. Proc. c. 33.

Says Mr. Wharton:

"At common law it was not necessary to charge in an indictment for murder that the murder was committed in the perpetration of another crime, in order to introduce proof showing that a felony was attempted in committing it. It was sufficient to charge murder in the common form, and then, upon proof that it was committed in the perpetration of a felony malice, deliberation, and premeditation were implied. And statutes defining different degrees of murder, subjecting them to different punishment, do not render it necessary to alter the form of an indictment for the crime, or to supply such facts as would show the offense to be murder in any particular degree. And an indictment in the common law form is sufficient under

statutes dividing the crime of murder into degrees, and providing that all murder perpetrated in the commision of, or attempt to commit, a felony, or certain named felonies, is murder in the first degree, as a charge of murder thereunder. Nor is it necessary to state in an indictment for murder the grade of the offense, where it was committed in the perpetration of, or attempt to perpetrate, an offense enumerated in the statute; nor to allege an intent to kill. The perpetration of, or attempt to perpetrate, any of the named felonies, during which attempt a homicide is committed, in such case stands for, and is the legal equivalent of, the premeditation, deliberation, etc., which otherwise are necessary attributes of murder in the first degree. The felony in such case is but a link in the chain of evidence to show malice, deliberation, and premeditation, and, where the indictment charges a killing upon express malice only, proof is admissible to show that the killing was committed in the perpetration of a felony, or of one of the enumerated felonies, or that the motive of the accused in perpetrating the murder was to commit such crime. And that a murder was committed in the perpetration of, or attempt to perpetrate, either arson, rape, robbery, or burglary, is admissible as a part of the *res gestae* under an indictment charging murder by violence upon express malice aforethought. And an instruction as to murder in an attempt to commit a felony in the language of the statute is warranted. And a person indicted for murder in the first degree under a charge of deliberation and premeditation may be convicted of homicide committed in the perpetration of a felony, though its commission while in such perpetration was not specially pleaded. So the same result is arrived at under statutes providing that it shall not be necessary in an indictment for murder to set forth the manner in which, or the means by which, the death of the deceased was caused, and it is sufficient under them to charge a felonious and malicious killing, without charging that it was done in the commission of a felony." (Wharton on Homicide [3d Ed.] p. 875.)

See, also, 1 McClain, Cr. Law. sec. 355.

In *State v. Myers,* 99 Mo. 113, 12 S. W. 517, it is said by the court:

"The perpetration or attempt to perpetrate any of the felonies mentioned in the statute during which attempt, etc., the homicide is committed, stands in lieu of, and is the legal equivalent of, that premeditation, deliberation, etc., which otherwise are necessary attributes of murder in the first degree."

To the same effect are the following authorities: *People v. Giblin*, 115 N. Y. 197, 21 N. E. 1062, 4 L. R. A. 757; *State v. King*, 24 Utah, 482, 68 Pac. 418, 91 Am. St. Rep. 808; *State v. Johnson*, 72 Iowa, 400, 34 N. W. 177; *Titus v. State*, 49 N. J. Law, 36, 7 Atl. 621; *Gay v. State*, 40 Tex. Cr. R. 242, 49 S. W. 612.

When the murder charged was committed by the defendant in the perpetration of a robbery or any other felony, malice, deliberation, and premeditated design are presumed.

The court refused to instruct the jury upon manslaughter, and its ruling in this respect is assigned as error. The refusal of the court to give the instructions requested on manslaughter was obviously based upon the idea that, under the undisputed evidence, there were no facts shown or suggested which would warrant the jury in finding the defendant guilty of manslaughter in either the first or second degree. Section 6826 (Compiled Laws 1909), Procedure Criminal, provides:

"On the trial of an indictment, questions of law are to be decided by the court, and questions of fact are to be decided by the jury; and, although the jury have the power to find a general verdict, which includes questions of law as well as of fact, they are bound, nevertheless, to receive the law which is laid down as such by the court."

And section 6875 provides:

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment, or of an attempt to commit the offense."

When murder is charged under the first subdivision of section 2268, *supra,* the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests. However, in this case, the defendant was tried for murder committed while engaged in the commission of a felony, and that was the only proof on the part of the prosecution. His defense was that he was not at the place of the homicide and a denial of any participation in the assault or robbery. We do not think that there was anything in this case as shown by the evidence tending to reduce it from

murder to manslaughter. If the defendant was guilty at all, it was of murder; for this reason we think there was no error in refusing to give the requested instructions on manslaughter.

From a careful consideration of the evidence, we are of the opinion that the verdict, in so far as it responds to the issues of guilty or not guilty of the crime of murder, is sustained by the evidence. While the jury might have had a reasonable doubt, they might also with propriety regard the evidence as sufficient to exclude every reasonable doubt of the defendant's guilt.

The learned counsel contend that the extreme punishment assessed by the jury in their verdict is the result of passion and prejudice. By the law of this state, the punishment to be inflicted for the crime of murder is left to the determination of the jury. Section 2275 (Compiled Laws 1909) of the Penal Code provides:

"Every person convicted of murder shall suffer death, or imprisonment at hard labor in the state penitentiary for life, at the discretion of the jury. Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor, and the judgment of the court court shall be in accordance therewith."

Under the statutes, the findings of the jury are conclusive upon the trial court, and the court below is without power or authority to render judgment and sentence except in accordance with the verdict. On appeal, however, our Criminal Procedure Act provides that:

"The appellate court may reverse, affirm, or modify the judgment appealed from, and may if necessary or proper, order a new trial." (Section 6955.)

Under this statute, this court, exercising its revisory jurisdiction, has the power and authority to modify any judgment appealed from by reducing the sentence. However, that power should not be exercised unless it is apparent that injustice has been done.

The inculpatory evidence was circumstantial, except the testimony of Thelma Morgan, a negro prostitute who had herself been in custody on the same charge. Her testimony is not entitled to much credit, not because of her character simply, but because

her statements are contradictory. Briefly stated, her testimony is that she and Sadie King were street walking, and were accosted by Watson, the deceased, and, after agreeing on a price, she and Watson went to a vacant lot, leaving Sadie King waiting on the sidewalk; that, while in the act of intercourse, she heard something strike Watson, and, turning her head, she saw the defendant Fritz; that she screamed for help, and yelled "murder" several times; that Fritz came up to where she was and pulled her from under the wounded man, and searched her, and then robbed him; that she then went back to Sadie King, and then met Jeff Morgan, her husband, and went home with him; that she told two or three people about it, but did not mention the affair to Sadie King or to her husband.

Sadie King testified that, while waiting on the sidewalk for Thelma Morgan to return from the assignation, she heard no noise or outcry of any kind, and did not know that Watson had been hurt until three days later. Jeff Morgan denied that he gave to the defendant the watch and chain and $10 gold piece, the property of the deceased.

The credibility of these witnesses and the weight to be accorded their testimony were matters for the jury to determine. However, we think that under the circumtsances, as shown by all the evidence, Thelma and Jeff Morgan were accomplices to the defendant, and when we consider the fact that the murder of Watson occurred on September 14th, and in 14 days from that time the defendant was put upon trial, and that the order appointing counsel to defend him was made only two days before the trial, and the fact that the deceased was a white man and the defendant a negro, and the further fact that although Watson, the deceased, lived until the following day, he failed to make any statement or declaration as to how his injuries were received, it is our opinion, taking all these circumstances of the case into consideration, that it would be an injustice, the Morgans having been allowed to go free, to affirm the judgment and sentence, and this court, without the power given under the statute to modify the judgment, would be compelled to reverse the case and remand it for a new trial.

The power to pardon, parole, reprieve, or commute is. vested in the chief executive of the state (Const. art. 6, sec. 10 [159 Williams']), and this, it is suggested, is the source from which relief must be obtained in such cases as this, and that, as it is the settled policy of the present governor to commute in all cases where the death penalty is imposed, no execption would be made by him in this case. The power of this court to modify a judgment inflicting the death penalty for murder to imprisonment for life at hard labor, when deemed proper in the furtherance of justice is in no sense the power of commutation of the sentence of the lower court. Commutation can be granted only by the chief executive of the state, and is granted as a matter of clemency. The judicial power to modify a judgment and sentence and the executive power to pardon, parole, or commute are wholly distinct in their nature. The one is an award of justice, and the' other is an act of grace. Commutation is a matter of discretion, and may be refused. Justice is imperative, and must not be denied. The fact that the governor has the power to commute does not abridge the defendant's right to appeal to this court for relief. In other words the provision of our criminal procedure act makes it the duty of this court to review the record, and in a proper case, if necessary in the furtherance of justice, modify the judgment so as to prevent the imposition of punishment which the evidence will not warrant.

In this case we think that the judgment and sentence should be modified to imprisonment for life at hard labor. In reaching this conclusion, we do not. wish to be understood as being in favor of abolishing capital punishment as a penalty for murder. We think that capital punishment, at the discretion of the jury, as the penalty of murder, is essential to the security of society, and we have no sympathy with that sentimental humanitarianism which, in the exercise of a mawkish sympathy for a heartless, unfeeling, felonious assassin, forgets and wholly ignores the innocent murdered victim and the necessary safeguards of society. If capital punishment should be abolished, without some limitation of the pardoning power in convictions of murder and manslaughter, and the indiscriminate exercise of the pardoning power in this

character of conviction should continue, it cannot be doubted that convictions of murder and manslaughter in this state would then in many cases be but a mere mockery of law and justice.

For the reasons stated, the judgment of the district court of Muskogee county will be modified to the extent that the sentence will be changed from the infliction of the penalty of death to that of imprisonment in the state penitentiary at hard labor for life, and, as thus modified, the judgment is affirmed.

FURMAN, P. J., and ARMSTRONG, J., concur.