195 F.2d 583 (1952)
UNITED STATES
v.
ROSENBERG et al.
Nos. 137-138, Dockets 22201, 22202.
United States Court of Appeals Second Circuit.
Argued January 10, 1952.
Decided February 25, 1952.
Rehearing Denied April 8, 1952.
*584 *585 *586 *587 *588 *589 *590 Myles J. Lane, New York City (Roy M. Cohn, James B. Kilsheimer 3d and Stanley D. Robinson, all of New York City, of counsel), for United States of America.
Emanuel H. Bloch, New York City, for Julius Rosenberg and Ethel Rosenberg.
Harold M. Phillips and Edward Kuntz, New York City (Howard N. Meyer, New York City, of counsel), for Morton Sobell.
Before SWAN, Chief Judge, and CHASE and FRANK, Circuit Judges.
Rehearing Denied in No. 22201 April 8, 1952.
FRANK, Circuit Judge.
Since two of the defendants must be put to death if the judgments stand, it goes without saying that we have scrutinized the record with extraordinary care to see whether it contains any of the errors asserted on this appeal.
1. The Supreme Court has held that the Espionage Act of 1917 makes criminal, and subject to the prescribed penalties, the communication of the prohibited information to the advantage of "any foreign nation," even if such communication does not injure this country. See Gorin v. United States, 312 U.S. 19, 29-30, 61 S.Ct. 429, 435, 85 L.Ed. 488, where the Court said: "Nor do we think it necessary to prove that the information obtained was to be used to the injury of the United States. The statute is explicit in phrasing the crime of espionage as an act of obtaining information relating to the national defense `to be used * * * to the advantage of any foreign nation.' No distinction is made between friend or enemy. Unhappily the status of a foreign government may change. The evil which the statute punishes is the obtaining or furnishing of this guarded information, either to our hurt or another's gain."[1] Accordingly, the trial judge, in the case at bar, properly instructed the jury as follows: "I charge you that whether the Union of Soviet Socialist Republics was an ally or friendly nation during the period of the alleged conspiracy is immaterial, and you are *591 not to consider that at all in your deliberations."
In United States v. Heine, 2 Cir., 151 F.2d 813, we so interpreted the statute as to make it inapplicable to information which our armed forces had consented to have made public. The defendants now assert that the indictment, which followed the language of the statute, was fatally defective since it did not allege that the matter there described was not public. But the statutory language necessarily imported its correct judicial interpretation. Consequently the indictment was sufficient under Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which provides: "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. * * * The indictment or information shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated."[2]
In the Gorin case, the Supreme Court rejected the contention of the unconstitutionality of the statute on the ground of its vagueness under the due process clause of the Fifth Amendment. By implication, it sustained the validity of the statute against any identical argument of vagueness, such as the one urged here, under the Sixth Amendment, since the Court's decision was primarily concerned with whether the statute set up definite enough standards of guilt to advise a citizen of what exactly was forbidden and ipso facto a potential defendant of what exactly he was charged with doing. The Court said [312 U.S. 19, 61 S.Ct. 433]: "But we find no uncertainty in this statute which deprives a person of the ability to predetermine whether a contemplated action is criminal under the provisions of this law. The obvious delimiting words in the statute are those requiring `intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation.' This requires those prosecuted to have acted in bad faith. The sanctions apply only when scienter is established. * * * Finally, we are of the view that the use of the words `national defense' has given them, as here employed, a well understood connotation. * * * National defense, the Government maintains, `is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness.' We agree that the words `national defense' in the Espionage Act carry that meaning. * * The language employed appears sufficiently definite to apprise the public of prohibited activities and is consonant with due process."[3]
We think the statute valid under the First Amendment as well. The communication to a foreign government of secret material connected with the national defense can by no far-fetched reasoning be included within the area of First-Amendment protected free speech. As interpreted in the Gorin case, the statute forbids nothing except such communication. The Court's decision that the statute *592 was definite enough to tell citizens what was prohibited satisfies appellants' contention that many legitimate exercises of First-Amendment rights will fall within the language of the statute. The Court said, "This requires those prosecuted to have acted in bad faith. The sanctions apply only when scienter is established." Stripped down, defendants' First-Amendment argument is the same as their argument under the Fifth and Sixth  i. e., vagueness  and we think the Supreme Court has answered that argument. "A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Boyce Motor Lines v. United States, 342 U.S. 327, 72 S.Ct. 329, 330.[4]
2. The defendants, in their briefs and oral arguments in this court, have attacked the reliability of the damaging testimony given against them by the government's chief witnesses who are all selfconfessed spies, and particularly the credibility of the testimony of the Greenglasses, one of whom the government has not prosecuted and the other of whom received a relatively mild sentence. Doubtless, if that testimony were disregarded, the conviction could not stand. But where trial is by jury, this court is not allowed to consider the credibility of witnesses or the reliability of testimony. Particularly in the federal judicial system, that is the jury's province.
The jury here were warned by the trial judge as follows: "As to the testimony of David Greenglass, Ruth Greenglass and Harry Gold, you must consider it carefully and act upon it with caution, for they are accused of being accomplices. An accomplice in this case is anybody that the prosecution charges agreed or confederated with any or all of the defendants in the commission of the crime charged, as alleged in the indictment. I am not saying that, because a person is a co-conspirator or an accomplice, he or she is not to be believed. If this were so, many cases in this court could not be proven. In the Federal Court a defendant can be convicted upon the uncorroborated testimony of an accomplice whose testimony satisfies the jury of the defendant's guilt beyond a reasonable doubt." So instructed, the jury found defendants guilty. Faced with such a verdict, this court is obligated to assume that the jury believed the evidence unfavorable to the defendants. On that assumption, the evidence to sustain the verdict is more than ample.
3. Defendants, however, tell us that the trial judge behaved himself so improperly as to deprive them of a fair trial. Defendants' counsel first broached this suggestion on a motion for mistrial after all the evidence had been heard, said that *593 the judge's alleged fault had been "inadvertent," and added that the judge had "been extremely courteous to us and afforded us lawyers every privilege that a lawyer should expect in a criminal case." Soon after the denial of this motion, counsel for the Rosenbergs, summing up for the jury, stated that "we feel that the trial has been conducted * * * with that dignity and that decorum that befits an American trial." Still later, the same counsel said that "the court conducted itself as an American judge." These remarks, by a highly competent and experienced lawyer, are not compatible with the complaints now made. Nor are those complaints deserved. We think the judge stayed well inside the discretion allowed him.
He is charged mainly with taking too active a part in the trial process by his questioning of witnesses. By this questioning he is alleged to have (1) emphasized key points of the government's case; (2) protected and rehabilitated government witnesses; (3) commented on evidence as immaterial or dismissed contradictions brought out by defense attorney as not very important or convincing; (4) examined the defendants with hostility. We have carefully examined each of the hundred or so incidents cited by defendants. Several representative incidents are set out in the footnote.[5] In general, we *594 can find no purpose in the judge's questioning except that of clarification. If, with that purpose, he gave witnesses who had contradicted themselves a chance to resolve that conflict, and took away defendants' temporary advantage with the jury, it was an unavoidable incident of his unchallenged power to bring out the facts of the case. See, e. g., Simon v. United States, 4 Cir., 123 F.2d 80, 83, certiorari denied 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555: "It cannot be too often repeated, or too strongly emphasized, that the function of a federal trial judge is not that of an umpire or of a moderator at a town meeting. He sits to see that justice is done in the cases heard before him; and it is his duty to see that a case on trial is presented in such way as to be understood by the jury, as well as by himself. He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other. In no case is the exercise of this power of the judge more important than in one like this, involving, as it does, lengthy circumstantial testimony, the force of which may be lost upon the jury if it is not properly presented or if its salient features are not called to the jury's attention at the time. The judge is the only disinterested lawyer connected with the proceeding. He has no interest except to see that justice is done, and he has no more important duty than to see that the facts are properly developed and that their bearing upon the question at issue are clearly understood by the jury." If some of his questions and comments indicated his opinion of the merits of counsel's attack or of the witnesses' testimony, it cannot be said that he committed reversible error, since, unlike judges in many of our state courts, a federal judge may comment outright on any portion of the evidence, telling the jury how it struck him, whom he believed, or disbelieved, and the like, provided only that he advises the jury that they are in no way bound by his expressions of such views. United States v. Aaron, 2 Cir., 190 F.2d 144, 146-147; United States v. Chiarella, 2 Cir., 184 F.2d 903, 908; reversed on government's confession of error 341 U.S. 946, 71 S.Ct. 1004, 95 L.Ed. 1370; Pfaff v. United States, 7 Cir., 85 F.2d 309, 311; United States v. Warren, 2 Cir., 120 F.2d 211, 212; Ochoa v. United States, 9 Cir., 167 F.2d 341, 344; Herron v. Southern Pacific Co., 283 U.S. 91, 95, 51 S.Ct. 383, 75 L.Ed. 857; Glasser v. United States, 315 U.S. 60, 82, 62 S.Ct. 457, 86 L.Ed. 680.
Here the trial judge said in his charge: "No matter how careful a judge may be to avoid it, there is always the possibility that the jury or some particular juror may get an impression that the judge has some *595 opinion with reference to the guilt or innocence of the defendants, or that he thinks that some particular phase of the case is more important than another, or that some particular witness is more credible than another, or that a certain inference of fact should not be made and so on. If you have formed any such impression you must put it out of your mind and utterly disregard it. Nothing I have said during the trial nor in these instructions was intended to give any such impression; nor were any remarks or questions addressed to any of the witnesses or to counsel so intended. On the contrary, I have been scrupulously careful to avoid any comment which might even remotely suggest that I considered the subjects of the weight of testimony, the credibility of witnesses, the inferences to be drawn or the relative importance of one segment of the evidence as against another, of the determination of the guilt or innocence of the defendants, as coming within the orbit of any of my functions as the presiding Judge in this trial. And so I tell you again, you are the sole and exclusive judges of the facts of this case; you, and you alone, will pass upon the credibility of all the witnesses, all in accordance with the instructions on that subject, which I shall give you later. Despite anything said by me or by counsel, your recollection of the testimony must prevail whenever your recollection differs from what I have said or what counsel for either side have said in argument or otherwise; it is for you to determine what the proofs adduced by both sides disclose, regardless of anything said by me in the brief and necessarily incomplete summaries which I have given you of the contentions of the parties; and it is for you and you alone to weigh the proofs, draw such inferences of fact therefrom as you determine should be drawn and to decide each and every one of the issues of fact in the case."
4. Evidence was introduced to the effect (1) that the defendants expressed a preference for the Russian social and economic organization over ours, and (2) that the defendants were members of the Communist Party. The defendants say this evidence was incompetent to show they would commit espionage for Russia, and that it improperly inflamed the jury against them. We think the evidence possessed relevance. An American's devotion to another country's welfare cannot of course constitute proof that he has spied for that other country. But the jurors may reasonably infer that he is more likely to spy for it than other Americans not similarly devoted. Hence this attitude bears on a possible motive for his spying, or on a possible intent to do so when there is other evidence in the case that he did such spying. We have held such testimony admissible in a similar case involving espionage for Nazi Germany. United States v. Molzahn, 2 Cir., 135 F.2d 92, 97, certiorari denied 319 U.S. 774, 63 S.Ct. 1440, 87 L.Ed. 1721. See also Haupt v. United States, 330 U.S. 631, 642, 67 S.Ct. 874, 91 L.Ed. 1145.
Communist Party membership presents a somewhat more complicated problem than pro-Soviet statements. The government had to prove that the Communist Party was tied to Soviet causes in order to make membership in it meaningful as evidence of motive or intent to aid Russia. Early in the trial, the trial judge so cautioned the jury: "I want you to understand right at the outset that the fact that they were members of the Communist Party does not establish the elements necessary to prove them guilty of the crime charged in this indictment which is conspiracy to commit espionage. * * * The government will have to establish that there is some connection between communism and committing the offense charged in the indictment." To that end, the government put Elizabeth Bentley on the stand. She testified that the American Communist Party was part of, and subject to, the Communist International; that the Party received orders from Russia to propagandize, spy, and sabotage; and that Party members were bound to go along with those orders under threat of expulsion. If the jury believed her, she supplied the missing link connecting the Communist Party with the Soviet Union, and *596 making Communist Party membership probative of motive or intent to aid Russia.[6]
Of course, such evidence can be highly inflammatory in a jury trial. This court and others have recognized that the Communist label yields marked ill-will for its American wearer. See, e. g., Grant v. Readers Digest Association, 2 Cir., 151 F.2d 733; Mencher v. Chesley, 297 N.Y. 94, 100, 75 N.E.2d 257. Whether and how much of that kind of evidence should come into a trial like this is a matter for carefully-exercised judicial discretion. We think the trial judge here did not abuse that discretion. Each time Party membership was alluded to, and again in his final charge, the judge cautioned the jurors "not to determine the guilt or innocence of a defendant on whether or not he is a Communist." It may be that such warnings are no more than an empty ritual without any practical effect on the jurors; see Mr. Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790.[7] If so, this danger is one of the risks run in a trial by jury; and the defendants made no effort to procure a trial by a judge alone, under Criminal Rule 23(a).
5. Early in the trial Elitcher testified that he had accompanied Sobell on a hurried ride to the Rosenbergs to deliver "valuable" information to Julius. This ride was precipitated by Elitcher's suspicion, recounted to Sobell, that he, Elitcher, was being followed. Elitcher testified about Sobell as follows: "I turned to him and said, `Well, what does Julie think about this, my being followed?' He said `It is all right; don't be concerned about it; it is O. K.' He then said Rosenberg had told him that he once talked to Elizabeth Bentley on the phone but he was pretty sure she didn't know who he was and therefore everything was all right."
Defendants at the trial neither objected to this testimony nor moved to strike it. They now contend that it was inadmissible hearsay. The government contends that it was not hearsay since it was a report of a statement by Sobell, one of the Rosenbergs' fellow-conspirators, about something Rosenberg said in furtherance of the conspiracy. If we assume that this contention is not sound,[8] nevertheless the jury was properly allowed to consider this testimony. For, as the Supreme Court has held as to hearsay testimony: "If evidence of this kind is admitted without objection, it is to be considered, and accorded its natural probative effect, as if it were in law admissible." Spiller v. Atchison, T. & S. F. Ry. Co., 253 U.S. 117, 130, 40 S.Ct. 466, 472, 64 L. Ed. 810; Diaz v. United States, 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500; Schlemmer v. Buffalo, Rochester & P. Ry. Co., 205 U.S. 1, 8, 9, 27 S.Ct. 407, 51 L. Ed. 681; Dowling v. Jones, 2 Cir., 67 F. 2d 537, 539. The federal authorities are unanimous on this point.[9]
*597 Greenglass also testified that Julius Rosenberg had said Miss Bentley probably knew him. The jury was therefore entitled to believe, on the basis of Elitcher's and Greenglass' testimony that Julius had spoken on the phone to Miss Bentley. In those circumstances, we see no error in permitting Miss Bentley to testify, over defendants' objections, as follows: She received several phone calls in 1943 from a man who called himself "Julius"  whose voice she did not recognize. She would then call Golos, a top Russian spy, and give him Julius' messages  acting as a go-between for "Julius" and Golos. From her talks with "Julius" and Golos, she learned that "Julius" lived in Knickerbocker Village  where, in fact, Rosenberg lived.
The testimony of Elitcher and Greenglass supplied sufficient circumstantial evidence to make it proper to allow the jury to infer that it was Julius Rosenberg, the defendant who, by phone, gave Miss Bentley the information she passed on to Golos. Jarvis v. United States, 1 Cir., 90 F.2d 243, certiorari denied 302 U. S. 705, 58 S.Ct. 25, 82 L.Ed. 544; 7 Wigmore, Evidence, sec. 2155. Moreover, according to Greenglass' testimony, Julius Rosenberg told the Greenglasses that an emissary would contact them in New Mexico bearing greetings from himself, Julius; Harry Gold testified that, by command of Yakolev, another spy, he, Harry Gold, bore the greeting, "I come from Julius," when he met up with the Greenglasses, per arrangement, in Albuquerque. The trial judge, of course, told the jury that they were free to accept or reject the inference that it was Rosenberg who called Miss Bentley.
6. The trial judge instructed the jury: "Because of the development of highly destructive weapons and their highly guarded possession by nations existing in a state of tension with one another, the enforcement of the espionage laws takes on a new significance. Our national well-being requires that we guard against spying on the secrets of our defense." Concerning this statement defendants argue: "The mandate to the jury to correlate the tensions of the times with the `new significance' to enforce the espionage laws was not only an irrelevance, but licensed the triers of the facts to yield to their emotional bias and insinuated that it would be a reflection on their responsibility as patriotic citizens if they returned a verdict other than `guilty.'" We do not agree. For the judge also said that he did "not mean that the mere allegation or use of the word `espionage' should justify convicting innocent persons"; and he cautioned the jurors that it was their duty "to approach [the] task of determining the issues with * * * minds completely barren of prejudice or sympathy," to "weigh the evidence in this case calmly and dispassionately * * *." It can hardly be seriously contended that commenting on the "new significance" of espionage law enforcement gave the jury a green light to convict on emotions rather than evidence.
7. In summing up, Rosenberg's counsel argued to the jury that the Greenglasses' testimony should not be credited because they testified as part of an understanding with the prosecutor that Ruth Greenglass would not be prosecuted and that David Greenglass would receive a relatively light sentence. When, soon after the jury heard this argument, the judge instructed the jury, he said they should consider whether the Greenglasses testified as a result of business difficulties,[10] "or for some other unknown reason." It is urged that, as this statement inaccurately characterized defendants' argument, it constitutes error. We think not. The judge had no duty to repeat all the lawyers' arguments which the jury had heard a short time before. He explicitly told the jury that he could not cover all of the arguments made by both sides in their summations, and that his reference to some portions of evidence and not others "should *598 not be taken as * * * any indication as to [his] opinion of the comparative importance or weight of that particular evidence." In addition, he explained (as we have already noted) that the Greenglasses were accomplices, and that their testimony must be carefully examined for that reason.
8. David Greenglass testified that Julius admitted "stealing" a proximity fuse from the Emerson Radio Company where he worked, and giving the fuse to Russia. On objection by defendants to the word "stealing," the court ordered it stricken. Defendants complain of the denial of their motions to strike all this testimony. They urge it was irrelevant since it was not shown that the proximity fuse was either secret or connected with national defense. The proximity fuse, be it noted, was an important World War II development which vastly increased the potential damage range of exploding shells. The nature of the device itself strongly suggests that it was secret, and unequivocally shows that it was connected with the national defense. At any rate, the testimony was admissible to show an intent on Julius' part to aid Russia.
9. The Rosenbergs contend that four Government exhibits (2, 6, 7 and 8), consisting of sketches made by David Greenglass of lens molds and an atom bomb were improperly admitted in evidence. Exhibits 2 and 8 are diagrams of a clover-leaf type high explosive lens mold used in atomic bomb experiments and a cross-section of an atom bomb, respectively. David Greenglass testified that these diagrams, which he reproduced for use at the trial, were accurate replicas of sketches given by him to Julius Rosenberg in 1945, and last seen by him at that time. Greenglass further testified that Exhibits 6 and 7 were accurate representations of lens mold sketches which he turned over to Harry Gold, in conjunction with a report on atomic experimentation, in June, 1945. The original sketches were allegedly delivered to Yakolev by Gold and transmitted to the Soviet Union. Greenglass explained all four exhibits to the jury and used them to illustrate his testimonial description of the information he imparted to Rosenberg and Gold. Such sketches would ordinarily be admissible under the "map, diagram, and chart" rule which permits a witness to clarify his testimony by written illustration, so as to communicate complicated or confusing information more easily to the jury. Golden Eagle Farm Products v. Approved Dehydrating Co., 2 Cir., 147 F.2d 359. Defendants also object because David's superiors at Los Alamos were allowed to examine these sketches and to testify that they were reasonably accurate portrayals of the lens mold and atomic mechanisms used in the experimental station. We see no error here. A witness may always comment upon the substance or import of another witness' testimony; there is no reason to differentiate between verbal and nonverbal testimony in this respect. At no time were the sketches held out as those actually transmitted by Greenglass to Russia or exact replicas or copies thereof. They represented only Greenglass' recollection of what he had given the foreign agents. Hence there was no infraction of the secondary evidence rule.
10. The jury, during its deliberations, asked for a reading of that part of Ruth Greenglass' testimony covering the period from the time Rosenberg first approached her for espionage to the return of her husband to New York in 1945. Out of the jury's presence, defense counsel then asked the judge to have read to the jury the cross-examination covering the same period. The judge said he would not, without an express request from the jury. After the direct had been read to the jury, the judge asked them if they had what they wanted, and they said yes. Defense counsel, then, in the jurors' presence, again requested that the cross-examination be read. The judge at once replied that he would read only what the jury asked for. The jurors remained silent. Defense counsel objected. They now argue that the failure to comply with their request was prejudicial error. We think not. We think that the jury understood from the colloquy that the cross would be read if the jurors so desired, and that their *599 silence meant they had no such desire. Indeed, defendants' own argument bears this out: They do not assert that the failure to read the cross was harmful because the cross contradicted or markedly differed from the direct, but, on the contrary, because it repeated the direct almost word for word, so that (say defendants) the jury, had it heard the cross, might have concluded that the testimony was a rehearsed falsehood. However, but a short time previously, Rosenberg's counsel, in summation to the jury, had made precisely that point (i. e., that the cross parroted the direct). If the jurors had been impressed by this argument and, on that account, wanted Ruth's cross to check this very point, they would almost certainly have asked especially that the cross be read, particularly after defense counsel, in their presence, made this request. Accordingly, we hold that the refusal to have the cross read was within the trial judge's discretion.
11. As part of its case in chief, the government introduced testimony that, in 1950, after the arrest of the British atomic physicist, Dr. Klaus Fuchs, for espionage on behalf of Russia, Julius Rosenberg warned Greenglass to leave this country by way of Mexico; that Rosenberg repeated this warning after Gold's arrest; that Julius said he and his wife also intended to flee to Mexico. When the government rested, the Rosenbergs took the stand; on direct, among other things, they contradicted the foregoing testimony. On March 26, 1951, during Julius Rosenberg's cross-examination, he denied having had passport pictures taken in May or June 1950; on March 27, 1951, after the defendants had rested their case, the government called one Schneider, a professional photographer, as a rebuttal witness. Defense counsel at once objected to any testimony by Schneider, on the ground that his name was not on the list of witnesses submitted before the trial to the defendants in accordance with 18 U.S.C. § 3432.[11] Thereupon, in answer to questions put by the prosecutor, Schneider testified that, on March 26, 1951, two F. B. I. agents came to see him, and that then for the first time had anyone communicated with him about the subject for which he was called as a witness. Over objection by the defense on the ground that Schneider's testimony was "not proper rebuttal," he was then allowed to testify that, in May or June 1950, at his photography shop, he had taken the photographs of the Rosenbergs and their children, and that at that time Julius Rosenberg had said the pictures were needed to enable the Rosenberg family to go abroad.[12]
The statutory requirement concerning the list of witnesses to be supplied before trial has been held inapplicable to a rebuttal witness.[13] Defendants argue that Schneider's testimony was inadmissible, since it served merely to corroborate evidence introduced by the government on its case-in-chief and was thus not rebuttal of new matter arising on defendants' case. A majority of this court rejects this argument.[14] But, even if this argument is sound, the reception of this testimony was not erroneous. As it was a reasonable inference from Schneider's testimony that the government did not know of Schneider until the day before he was called as a witness, it could not have included his name in the witness-list handed defendants before the trial, which began some three weeks earlier. Consequently, the statute, properly interpreted, did not exclude Schneider's testimony altogether. See United States v. Schneider, 21 D.C. 381, 413: "The statute was never intended to preclude the United *600 States from making use of any material testimony discovered during the progress of the trial, and all that it exacts of the prosecuting officer is that he shall in good faith furnish to the prisoner, before the trial, the names of all witnesses then known to him and intended to be used at the trial." It might well have been error to refuse a reasonable request for adjournment coupled with some showing of surprise. But defendants made no such request.[15]
12. Sobell raises several questions affecting his conviction. The most important of these is whether or not he was proved to be a member of the Rosenberg-Greenglass-Gold conspiracy to ship information to Russia. Even accepting all of Elitcher's testimony as true, says Sobell, it showed only that he, Sobell, conspired with Julius Rosenberg to solicit Elitcher's aid in espionage activities along with that of other young engineers, and to send abroad certain kinds of military engineering and fire control information,[16] but no evidence connected him in any way with the Greenglass-Gold-Rosenberg plan to ship atomic information from Los Alamos to the Soviet Union. At the end of the government's case, Sobell's counsel moved to dismiss the indictment on the ground that not one but two separate conspiracies had been proved by the government,[17] one involving Rosenberg, Greenglass and Gold, whose purpose was the transmission of atomic information, and the other involving Rosenberg and Sobell, aimed solely at the sending of various types of military information abroad. The motion was denied, the trial judge committing himself to the theory that the government's witnesses, if believed, proved one giant conspiracy, to send defense information abroad, of which the atomic espionage was only one "branch." Despite objection by Sobell's counsel, the judge charged the jury, on the one-conspiracy theory, as follows: "Again I want to emphasize that the conspiracy in this case is a conspiracy to obtain secret information pertaining to the national defense and then to transmit it to the Union of Soviet Socialist Republics. It is not a conspiracy to obtain information only about the atom bomb. I point that out because the Government contends that Sobell was in the general conspiracy to obtain information of a secret nature. To determine whether Morton Sobell was a member of the conspiracy you are only to consider the testimony of Max Elitcher, William Danziger and the testimony relating to the defendant Sobell's alleged attempt to flee the country. If you do not believe the testimony of Max Elitcher as it pertains to Sobell, then you must acquit the defendant Sobell. If you find that there was a conspiracy and that Morton Sobell was a member of the conspiracy, any statements or acts of any co-conspirators are binding upon him because the law is that once you have joined a conspiracy attempting to accomplish an unlawful objective, the acts of the co-conspirators done in furtherance of the same objective, even though the co-conspirators are unknown to you, are binding upon you."
If in fact, Sobell is right that two conspiracies were proved, then prejudicial error has been committed, for Sobell was jointly tried with major atomic energy spies whose acts and declarations were held binding upon him. What distinguishes a single conspiracy from several related ones is a single unified purpose, a "common end." This "common end" is in contradistinction to the "separate ends similar in character" *601 which characterize multiple conspiracies. United States v. McConnell, D.C.E.D.Pa., 285 F. 164, 166. Thus the Supreme Court has said that defendants who separately secure fraudulent loans through banking institutions from a single governmental agency, by means of a single broker, have separate albeit similar ends, and lack the single unified purpose of co-conspirators. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. On the other hand, salesmen who make illegal sales above ceiling price of a particular brand of whisky obtained from a particular wholesaler have a single unified purpose  to raise illegally the price of that whisky: "The whiskey was the same. The agreements related alike to its disposition. They comprehended illegal sales in the guise of legal ones. * * * The scheme was in fact the same scheme; the salesmen knew or must have known that others unknown to them were sharing in so large a project". Blumenthal v. United States, 332 U.S. 539, 557-558, 68 S.Ct. 248, 256, 92 L.Ed. 154.
A majority of this court have concluded, on the following grounds, that here there was a single unified purpose: The "common end" consisted of the transmission to the Soviet Union of any and all information relating to the national defense; such a single aim distinguishes this conspiracy from that in Kotteakos, where each defendant was interested in obtaining his own fraudulent loan only and not in the success of his fellow-borrowers. The case is closer to the Blumenthal situation, where all the salesmen had a united purpose to sell the shipment of whisky at an illegally high price. Sobell is confusing the particular part each conspirator played in the espionage activities with the end-all purpose of all the conspirators  the aiding of Russia by sending to it any and all kinds of secret information. It did not matter that Sobell knew nothing of the atomic episodes; he is nevertheless charged with the acts done by Greenglass, Gold and Rosenberg, in furtherance of the over-all conspiracy. The jury could and did reasonably find that Sobell consented to the dominant aim, and so became a member of the Rosenberg-Greenglass-Gold conspiracy.
The writer of this opinion disagrees. He thinks that there was error, in this respect, which requires that Sobell be given a new trial. The balance of this paragraph sets out the writer's reasons for dissenting on this issue. Even if Sobell, on Elitcher's testimony, could reasonably be held as a member of the Rosenberg-Gold-Greenglass conspiracy, the question of his membership should have been submitted to the jury. Elitcher's testimony would have supported either of two inferences i. e., that Sobell agreed only (1) to transmit certain kinds of military information to Russia or (2) that he agreed with the other conspirators to transmit "any military information of all kinds." The jury should have had the opportunity to choose between the inferences and to decide whether he actually joined the larger conspiracy. See Lefco v. United States, 3 Cir., 74 F.2d 66, 69. "Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it." United States v. Peoni, 2 Cir., 100 F.2d 401, 403, per Learned Hand, C. J. The judge's instructions (quoted above) do not, I think, make it clear to the jury that Sobell, in order to become a member of the larger conspiracy, had to agree to transmit all kinds of secret information, and not just certain kinds which he knew about.[18] In effect, he charged that if *602 the jury believed Elitcher's testimony, Sobell was a member of the larger conspiracy charged in the indictment.
13. Sobell alleges that the prosecutor's ill attempts at courtroom humor and "questions" containing inadmissible testimony deprived him of a fair trial. After examining each such incident, we cannot agree that, despite the judge's cautioning instructions to convict or acquit on the evidence alone, they were so important as to effect the jury adversely. Many of the so-called "loaded" questions were withdrawn before answering; objections to others were sustained and the prosecutor admonished; nothing in his summation concerning the defendants seems to have exceeded the liberal limits of legitimate partisanship and argumentation our courts customarily allow counsel. It is of some significance that Sobell's counsel himself, at the end of the trial, indicated that he thought the prosecutor had conducted himself fairly: "I am willing to shake his hand after a job that we both had to do." Similarly the Rosenbergs' counsel at the end of the trial acknowledged the good behavior of the prosecutor.
14. The prosecution introduced as an entry "in the regular course of business" a card made by an Immigration Inspector at the time Sobell re-entered the United States, stating that he had been "Deported from Mexico." This evidence is attacked as both irrelevant and hearsay. But Sobell's forced return to the United States was certainly relevant to the government's theory that he had fled to Mexico to escape prosecution, for otherwise the jury might had inferred that he had returned voluntarily to stand trial. The hearsay objection is equally without merit. As an entry of this type is required in the case of every deportee from Mexico and was made by the border inspector in the course of his duties, it qualifies as a business entry under 28 U.S.C. §§ 1732, 1733. The inspector who made the entry testified at the trial, and was available for cross-examination as to the extent of his observations and his reasons for making the entry.
15. At the end of the trial, after Sobell had been found guilty, his counsel made a motion in arrest of judgment based upon an affidavit by Sobell that he had been illegally abducted by Mexican police from his residence in Mexico City and taken across the border into the United States where he was delivered into the immediate custody of waiting United States agents. Sobell asked the trial judge to conduct a hearing on the question of whether United States officials had participated in, or instigated, his illegal kidnapping. Sobell claims that his conviction would be a nullity if it were proved that the government thus secured jurisdiction over his person in violation of United States law and international agreement.
The government answers that, even if United States officials had participated in Sobell's alleged kidnapping, the court in a criminal case, unlike a civil case, would still have jurisdiction over his person, as long as he was physically present at the trial. There appears to be authority to support this position. Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421; Mahon v. Justice, 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283; United States ex rel. Voigt v. Toombs, 5 Cir., 67 F.2d 744; United States v. Unverzagt, D.C.W.D.Wash., 299 F. 1015, affirmed 9 Cir., 5 F.2d 492, certiorari denied 269 U. S. 566, 46 S.Ct. 24, 70 L.Ed. 415; United States v. Insull, D.C.N.D.Ill., 8 F.Supp. 310, 311; Ex parte Lopez, D.C.S.D.Tex., 6 F. Supp. 342; Gillars v. United States, 87 U.S. App.D.C. 16, 182 F.2d 962; Chandler v. United States, 1 Cir., 171 F.2d 921, certiorari denied 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081. However, there are contrary arguments.[19] But we need not now decide that *603 question. For we think that Sobell waived his right to challenge personal jurisdiction in this trial. Rule 12(b) (2) of the Federal Rules of Criminal Procedure says: "Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, * * *." Yet Sobell made no such pre-trial motion challenging jurisdiction over his person, despite the fact that all the information contained in the post-trial affidavit was known to him at that time. When the government introduced evidence to show that Sobell had been legally deported from Mexico (evidence clearly contradictory to Sobell's present assertion), he made no move to bring to light the facts of his alleged illegal abduction.[20] He preferred to take his chances on the verdict, withholding his trump card until the trial was over. The Federal Rules of Criminal Procedure allow no such tactic. Under Rule 34, motions in arrest of judgment are allowed only (1) where the indictment charges no offense and (2) where the court had no jurisdiction over the offense charged. This situation, we think, falls into neither category. See United States v. Zisblatt, 2 Cir., 172 F.2d 740, 741-742; United States v. Bradford, 2 Cir., 1952, 194 F.2d 197. Personal jurisdiction can be waived in a criminal as well as a civil case. See Pon v. United States, 1 Cir., 168 F.2d 373, 374. United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425, cited by Sobell, allowed a defendant to move in arrest of judgment on the ground that he had been tried and convicted of an offense other than the one for which he had been surrendered to the United States by Great Britain pursuant to an extradition treaty. There, however, the defendant also challenged personal jurisdiction before trial, and no question of the timeliness of his motion was involved.
16. The trial judge sentenced Julius and Ethel Rosenberg to death. The statute under which they were convicted provides that whoever violates the pertinent subsection "in time of war shall be punished by death or by imprisonment for not more than thirty years." 18 U.S.C. § 794(b). Congress had the power to prescribe the death penalty for wartime espionage. See Cramer v. United States, 325 U.S. 1, 45, 65 S.Ct. 918, 89 L.Ed. 1441.[21] This, these defendants do not deny. They claim, rather, that, even if they were properly convicted, it was unconstitutional and an abuse of discretion for the trial judge to impose the extreme penalty in their particular case, and that we must reduce their sentences. In support of that contention they assert the following: They did not act from venal or *604 pecuniary motives; except for this conviction, their records as citizens and parents are unblemished; at the most, out of idealistic motives, they gave secret information to Soviet Russia when it was our wartime ally; for this breach, they are sentenced to die, while those who, according to the government, were their confederates, at least equally implicated in wartime espionage  Harry Gold, Emil Fuchs, Elizabeth Bentley and the Greenglasses  get off with far lighter sentences or go free altogether.[22] Finally, they argue, the death sentence is unprecedented in a case like this: No civil court has ever imposed this penalty in an espionage case, and it has been imposed by such a court in two treason cases only.[23]
Unless we are to over-rule sixty years of undeviating federal precedents, we must hold that an appellate court has no power to modify a sentence. "If there is one rule in the federal criminal practice which is firmly established, it is that the appellate court has no control over a sentence which is within the limits allowed by a statute." Gurera v. United States, 8 Cir., 40 F.2d 338, 340. See also, e. g., Beckett v. United States, 6 Cir., 84 F.2d 731, 733; Scala v. United States, 7 Cir., 54 F.2d 608, 611-612; Peterson v. United States, 4 Cir., 246 F. 118; Wallace v. United States, 7 Cir., 243 F. 300, 310; Feinberg v. United States, 8 Cir., 2 F.2d 955, 958; Carpenter v. United States, 4 Cir., 280 F. 598, 601; Smith v. United States, 9 Cir., 3 F.2d 1021; Hodgskin v. United States, 2 Cir., 279 F. 85, 94; United States v. Cohen, 2 Cir., 177 F.2d 523, 525; United States v. Ward, 2 Cir., 173 F.2d 628, 630; United States v. Gottfried, 2 Cir., 165 F.2d 360, 368; Voege v. United States, 2 Cir., 270 F. 219.[24] In Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 182, 76 L.Ed. 306, the Supreme Court said: "Under the circumstances, so far as disclosed, it is true that the imposition of the full penalty of fine and imprisonment upon each count seems unduly severe; but, there may have been other facts and circumstances before the trial court properly influencing the extent of the punishment. In any event, the matter was one for that court, with whose judgment there is no warrant for interference on our part."[25] Further discussion of this *605 subject my colleagues think unnecessary. Consequently, the subsequent paragraphs express the views only of the writer of this opinion.
That upper courts have or should have power to reduce harsh sentences has long been urged by some commentators. See, e. g., Hall, Reduction of Criminal Sentences on Appeal, 37 Col.L.Rev. 521, 762 (1937). The existence of such power may seem the more desirable in these days when, in the recent words of the Supreme Court, "Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence."[26] In England, Canada, and in several of our states, upper courts have held that they may revise sentences while affirming convictions. But these rulings were based on statutory authority. Com. v. Garramone, 307 Pa. 507, 161 A. 733, 89 A.L.R. 295; cf. A.L.I.Code of Cr.Proc. sec. 459.
Some of these state courts find such authority in statutes conferring power to "reverse, modify or affirm" judgments on appeal.[27] An identical power  to "affirm, modify * * * or reverse"  is given to federal courts of appeal and to the Supreme Court by 28 U.S.C.A. § 2106. That provision dates back to the Judiciary Act of 1789. See United States, for Use of John Davis Co. v. Illinois Surety Co., 7 Cir., 226 F. 653, 664. No decision by the Supreme Court or any federal court of appeals seems to have cited or considered this statute in passing on the question of the power to reduce a sentence when a conviction is affirmed. Were this question res nova, this court should give that section serious consideration.[28] Because, however, for six decades federal decisions, including that of the Supreme *606 Court in Blockburger v. United States, supra, have denied the existence of such authority, it is clear that the Supreme Court alone is in a position to hold that Sec. 2106 confers authority to reduce a sentence which is not outside the bounds set by *607 a valid statute.[29] As matters now stand, this court properly regards itself as powerless to exercise its own judgment concerning the alleged severity of the defendants' sentences.[30]
The Rosenbergs, however, advance a different argument, i. e., that, although the statute expressly and validly permits death sentences, we do have the power and the duty to order these particular death sentences reduced because they violate the Eighth Amendment of the Constitution, which forbids any "cruel and unusual punishments". Several courts have ruled that a sentence within the limits of a valid statute cannot amount to "cruel and unusual punishments", that, when a statute provides for such punishment, the statute only can be thus attacked. Johnson v. United States, 8 Cir., 126 F.2d 242, 251; Beckett v. United States, 6 Cir., 84 F.2d 731; Hemans v. United States, 6 Cir., 163 F.2d 228, 237-238, certiorari denied 332 U.S. 801, 68 S.Ct. 100, 92 L.Ed. 380; cf. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793. No federal decision seems to have held cruel and unusual any sentence imposed under a statute which itself was constitutional.[31] But let it be assumed that, even if the statute authorizing a sentence does not *608 violate the Eighth Amendment, still a particular sentence, within the literal terms of that statute, may do so, because of the specific circumstances of the case.[32] No such circumstances exist in this case. The test of a "cruel and unusual punishment" urged by the defendants  i. e., that "it shocks the conscience and sense of justice of the people of the United States"[33]  is not met here.
The test (unlike that applied when an upper court has discretion to modify sentences)[34] invites the criticism that it shifts the moral responsibility for a sentence from the consciences of the judges to the "common conscience."[35] But that criticism aside, this test counts against the defendants, for it means that this court, before it reduces a sentence as "cruel and unusual," must have reasonably good assurances that the sentence offends the "common conscience." And, in any context, such a standard  the community's attitude  is usually an unknowable.[36] It resembles a slithery shadow, since one can seldom learn, at all accurately, what the community, or a majority, actually feels.[37] Even a carefully-taken "public opinion poll" would be inconclusive in a case like this.[38] Cases are conceivable where there would be little doubt of a general public antipathy to a death sentence. But (for reasons noted below) this is not such a case.
In all likelihood, it would be  if the evidence were as the Rosenbergs depict it: They say that they were sentenced to death, not for espionage, but for political unorthodoxy and adherence to the Communist Party, and that (assuming they are guilty) they had only the best of motives in giving information to Russia which, at the time, was an ally of this country, praised as such by leading patriotic Americans. But the trial judge, in sentencing the Rosenbergs, relied on record evidence which (if believed) shows a very different picture. If this evidence be accepted, the conspiracy did not end in 1945, while Russia was still a "friend," but, as the trial judge phrased it, continued "during a period when it was apparent *609 to everybody that we were dealing with a hostile nation." For, according to government witnesses, in 1948 Julius Rosenberg was urging Elitcher to stay with the Navy Department so that he might obtain secret data; in 1948, Rosenberg received "valuable" information from Sobell; in 1950, Rosenberg gave Greenglass money to flee to Russia. This court cannot rule that the trial judge should have disbelieved those witnesses whom he saw and heard testify.[39] And, although the indictment did not charge, and therefore the jury did not find, that the Rosenbergs intended to harm the United States, the trial judge could properly consider the injury to this country of their conduct, in exercising his discretion as to the extent of sentences within the statutory limits. Cf. Williams v. New York, 337 U.S. 241, 251-252, 69 S.Ct. 1079, 1085, 93 L.Ed. 1337: "It is urged, however, that we should draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed. We cannot accept the contention. Leaving a sentencing judge free to avail himself of out-of-court information in making such a fateful choice of sentences does secure to him a broad discretionary power, one susceptible of abuse. But in considering whether a rigid constitutional barrier should be created, it must be remembered that there is possibility of abuse wherever a judge must choose between life imprisonment and death. And it is conceded that no federal constitutional objection would have been possible if the judge here had sentenced appellant to death because appellant's trial manner impressed the judge that appellant was a bad risk for society, or if the judge had sentenced him to death giving no reason at all. We cannot say that the due-process clause renders a sentence void merely because a judge gets additional out-of-court information to assist him in the exercise of this awesome power of imposing the death sentence."
We must, then, consider the case as one in which death sentences have been imposed on Americans who conspired to pass important secret information to Russia, not only during 1944-1945, but also during the "cold war." Assuming the applicability of the community-attitude test proposed by these defendants, it is impossible to say that the community is shocked and outraged by such sentences resting on such facts. In applying that test, it is necessary to treat as immaterial the sentences given (or not given) to the other conspirators, and also to disregard what sentences this court would have imposed or what other trial judges have done in other espionage or in treason cases.[40] For such matters do not adequately reflect the prevailing mood of the public. In short, it cannot be held that these sentences are unconstitutional.[41]
Affirmed.
Petition for Rehearing in No. 22201.
In their petition for rehearing, the defendants, for the first time, urge as pertinent that portion of Article III, Section 3 of the Constitution, which provides: "Treason against the United States, shall consist only in levying War against them, or in adhering *610 to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." The Rosenbergs, as we understand them, rest two arguments on this provision.
(1) The first runs thus: (a) Had the defendants been indicted and tried for giving aid to an "enemy," the crime charged would have been treason, and they could not have been convicted unless the trial judge instructed the jury as to the two-witness rule and told the jury specifically the overt act or acts which a jury must find in order to justify a verdict of guilty.[1] (b) Here the defendants were indicted and tried for giving aid to a country which was not an "enemy." (c) Consequently, the crime of which they were accused was of the same kind as treason  but of a lesser degree. (d) The constitutional safeguards applicable to a trial of the greater crime of this kind must be applied to the lesser. (e) But here there were no such safeguards, since the trial judge did not give the instructions constitutionally required in a treason trial.
The Supreme Court's decision in Ex parte Quirin, 317 U.S. 1, 38, 63 S.Ct. 2, 16, 87 L. Ed. 3, disposes of this contention. There the defendants, including Haupt and Burger, United States citizens, were held guilty of violating the article of War which make it a crime, punishable by death, for an enemy belligerent to pass our boundaries without uniform or other insignia signifying belligerent status. 10 U.S.C.A. §§ 1471-1593. Admittedly, the conduct constituting this crime would also, in the case of Haupt and Burger, have constituted treason, but this crime of which the defendants were accused was more specific than treason. The Supreme Court (of its own motion) raised, and then rejected, the argument that, on this account, the procedural requirements of a treason trial must be, and had not been satisfied. The Court said: "The argument leaves out of account the nature of the offense which the Government charges and which the Act of Congress, by incorporating the law of war, punishes. It is that each petitioner, in circumstances which gave him the status of an enemy belligerent, passed our military and naval lines and defenses or went behind those lines, in civilian dress and with hostile purpose. The offense was complete when with that purpose they entered  or, having so entered, they remained upon  our territory in time of war without uniform or other appropriate means of identification. For that reason, even when committed by a citizen, the offense is distinct from the crime of treason defined in Article III, § 3 of the Constitution, since the absence of uniform essential to one is irrelevant to the other. Cf. Morgan v. Devine, 237 U.S. 632, 35 S.Ct. 712, 59 L.Ed. 1153; Albrecht v. United States, 273 U.S. 1, 11, 12, 47 S.Ct. 250, 253, 254, 71 L.Ed. 505." This ruling has been criticized. See e. g., Hurst, Treason in the United States, 58 Harvard Law Rev.(1945) 395, 421.[2] But *611 this ruling binds inferior courts such as ours.[3] In the Quirin case, the absence of uniform was an additional element, essential to Haupt's non-treason offense although irrelevant to his treason; in the Rosenbergs' case, an essential element of treason, giving aid to an "enemy," is irrelevant to the espionage offense.
(2) The Rosenbergs present a second argument, which is a variant of the first and is as follows: (a) Traditionally, and in this country by statute, the courts have been authorized to impose the death penalty for treason. (b) To authorize such a sentence for a similar but less grave offense, in the trial of which there are omitted the guaranteed safeguards of a treason trial, is to permit "cruel and unusual" punishment in violation of the Constitution. (c) That part of the Espionage Act which authorizes the death sentence is therefore unconstitutional. (d) Accordingly, the trial judge should be directed to reduce the sentence.[4]
This argument, we think, involves an unfounded assumption, i. e., that Congress will always authorize the death sentence for treason. Without that assumption the argument would compel the strange conclusion that, if Congress, in its discretion, authorized a maximum twenty-year penalty for treason, no greater punishment could be given for espionage, sedition or a similar crime without its becoming "cruel and unusual." Moreover, as the Quirin case had the unavoidable consequence of permitting death sentences to be imposed upon the citizen-saboteurs for crimes other than treason, the Supreme Court must there have implicitly rejected the "cruel and unusual" argument. As, however, the Supreme Court did not specifically discuss it, that Court may well think it desirable to review that aspect of our decision in this case.
Petition for rehearing denied.
NOTES
[1] In United States v. Heine, 2 Cir., 151 F.2d 813, 815, after stating that the words "to the advantage of a foreign nation", inserted while the statute was in process, "greatly enlarged its scope", we went on to say: "* * * for while it is true that it is somewhat hard to imagine instances in which anyone would be likely to transmit information `relating to the national defense,' which would be injurious to the United States, and yet not advantageous to a foreign power, it is possible to think of many cases where information might be advantageous to another power, and yet not injurious to the United States. The section as enacted necessarily implies that there are some kinds of information `relating to the national defense' which must not be given to a friendly power, not even to an ally, no matter how innocent, or even commendable, the purpose of the sender may be."
[2] Rule 7(f) says: "The court for cause may direct the filing of a bill of particulars." The Rosenbergs, like Sobell, might have requested such a bill if they were really confused as to whether or not they were charged with transmitting secret information. One of the overt acts charged in the indictment covered the reception by Julius of sketches of the experiment conducted at the Los Alamos project, a good indication that the material involved was secret.
[3] The defendants argue that the Gorin case is not binding here, even on the due-process argument, because that case "was decided under a concession of validity of the intent clauses which enabled the court to hold that they cured the unconstitutional vagueness of the criminal standard." We find nothing in the decision indicating any "concession of validity of the intent clauses." The attack was as broad as the concept of Fifth-Amendment due process. Nor do we think the Supreme Court, in sustaining the constitutionality of so important a statute, would rely on clauses valid only by concession, without examining those clauses themselves for constitutional vulnerability.
[4] The Supreme Court had in mind free speech considerations in the Gorin case, although there the statute had not been attacked on any such specific ground. For the Court said: "The philosophy behind the insistence that the prohibitions * * * upon which the indictment is based, are limited to the places and things which are specifically set out in section 1(a) relies upon the traditional freedom of discussion of matters connected with national defense which is permitted in this country. It would require, urge petitioners, the clearest sort of declaration by the Congress to bring under the statute the obtaining and delivering to a foreign government for its advantage of reports generally published and available * * *." Our court said in United States v. Heine, supra [151 F.2d 815], "Obviously, so drastic a repression of the free exchange of information it is wise carefully to scrutinize, lest extravagant and absurd consequences result."
[5] (1) Alleged emphasizing of key points of the Government's case:

Dorothy Abel, Ruth's sister, was under cross-examination as to specific declarations allegedly made by Julius in her presence with respect to the United States and the Soviet Union. The witness had replied that Julius criticized our Government because it was "capitalistic * * * that is about all I can remember." The following occurred:
"Mr. E. H. Bloch: What else?
"The Court: Is that the reason they assigned for preferring the Russian form of government?
"The Witness: Yes.
"The Court: Was there discussion of the relative merits of the capitalistic form of government as against communistic form?"
(2) Alleged protecting and rehabilitating of Government witnesses:
Elitcher had failed to record on his direct examination his presence at Julius' home in the week of Christmas, 1946, although he had been asked, in chronological approach, his meetings with Julius.
The cross-examiner:
"Question: You forgot about that?
"The Court: He wasn't asked about it if I remember and it might have been nothing to the Government's case. There is a certain inference in your question that he deliberately withheld it."
Ruth was being examined on the Jello box side she allegedly obtained from Julius and kept for many months to match with the other side produced by Gold. When pressed to describe the printing or words on this Jello box side, she answered that her lack of knowledge of details "was not pertinent." The interlocutor's motion to strike the answer was granted and the witness admitted she had not looked at the object in her possession.
"The Court: Now let me ask you this: what was important to you?"
The witness replied that her interest was confined to the use of the Jello box side as an identification medium to be matched with the expected courier's other side of the box.
"The Court: Excuse me, when the bearer of the other half of that side of the Jello box was to come to you, was it your primary purpose in seeing whether the two sides would fit together like a jig-saw puzzle?
"The Witness: Yes.
"The Court: Very well."
(3) Alleged improper comments on evidence:
Ruth, on cross-examination, was directed to go over her conversation with the Rosenbergs in November 1944. The cross-examiner, for the purpose of showing the witness was rehearsed, asked whether the witness' recounting of the incident was not a verbatim repetition of her direct testimony. The prosecutor objected; the following was the ruling:
"The Court: Your objection is sustained. I don't know exactly what the point is. If the witness has left out something, Mr. Bloch would say the witness didn't repeat the story accurately, and the witness repeats it accurately and apparently that isn't good."
(4) Alleged hostile examination of defendants:
By the Court:
"What were your own views about the subject matter of the United States having any weapon that Russia didn't have at that time? That is, in 1944 and 1945. A. I don't recall having any views at all about it.
"Q. Your mind was a blank on the subject. * * * There were never any discussions about it at all? A. Not about that, not about the weapon.
"Q. Was there any discussion at all as to any advantages which the United States had to make warfare that the Russians didn't have? A. No, nothing of that sort.
"Q. You never heard any discussions that there should be equalization between Russia and the United States? A. No, sir."
Julius had expressed to Ethel his belief that David was attempting to "blackmail" him when David's request to him for money in May or early June, 1950 was rejected and David had warned Julie "I just got to have that money and if you don't get me the money you are going to be sorry."
The Court:
"Q. Blackmail you. When did he try to blackmail you? A. Well, he threatened me to get money. I considered it blackmailing me.
"Q. What did he say he would do if you didn't give it to him? You said he said you would be sorry. A. Yes. I consider it blackmail when somebody says that.
"Q. Did he say what he would do to you? A. No, he didn't.
"Q. Did he say he would go to the authorities and tell them you were in a conspiracy with him to steal the atomic bomb secret? A. No.
"Q. Do you think that was what he had in mind? A. How could I know what he had in mind.
"Q. What do you mean by blackmail then? A. Maybe he threatened to punch me in the nose or something like that."
[6] Sobell argues that proof of his Communist Party membership in 1941 was too remote to bear on his intent to join the conspiracy in 1944. We think not. In United States v. Molzahn, supra, we held admissible statements evidencing defendant's sympathy with the Nazi regime seven years before the alleged conspiracy began.
[7] See also Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54, 61.
[8] The Rosenbergs argue that the statement was not made in furtherance of the conspiracy, since Elitcher was not a member of the conspiracy or an active source of information to it. The Government answers, with reason, that Rosenberg considered Elitcher still a good prospect for espionage, and the statement was made to calm him down so that he might be willing in the future to contribute.
[9] True, we may, of our own motion, notice egregious errors to which there were no objections below, if they "seriously affect the fairness, integrity, or public reputation of judicial proceedings." Johnson v. United States, 313 U.S. 189, 200-201, 63 S.Ct. 549, 555, 87 L.Ed. 704; Criminal Rule 52(b). That exception might conceivably govern here if we believed the failure to object to this testimony resulted from the incompetence of defendants' counsel. But the record shows that defendants' counsel were singularly astute and conscientious. We know, too, that an able trial lawyer, for one or more of a variety of reasons, will often withhold an objection to the reception of hearsay. When he has done so, and it turns out that the jury's verdict is adverse to his client, the lawyer may not assert that reception as error.
[10] There was testimony as to such difficulties.
[11] It reads: "A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with * * * a list * * * of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each * * * witness."
[12] No evidence was heard after March 27, 1950. Schneider was the last witness.
[13] Goldsby v. United States, 160 U.S. 70, 76, 16 S.Ct. 216, 40 L.Ed. 343; Gordon v. United States, 53 App.D.C. 154, 289 F. 552, 554.
[14] The writer of this opinion has some doubt as to whether it was rebuttal within the meaning of the cases relative to 18 U.S.C. § 3432. But see State v. McCumber, 202 Iowa 1382, 212 N.W. 137.
[15] Cf. McNabb v. United States, 6 Cir., 123 F.2d 848, 853, reversed on other grounds 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; A. L. I. Code of Criminal Procedure, s. 194; State v. Nolan, 31 Idaho 71, 169 P. 295; State v. Urban, 117 Kan. 130, 230 P. 77; Grandbouche v. People, 104 Colo. 175, 89 P.2d 577; State v. Harding, 108 Wash. 606, 185 P. 579.
[16] There was also evidence that Sobell delivered "valuable" information to Rosenberg in a 35-millimeter film can in 1950.
[17] Sobell's counsel argued that on the basis of the indictment and information obtained from an unsuccessful attempt to get a more enlightening bill of particulars, it was impossible for Sobell to ask for a severance earlier on these grounds. Although Sobell's position seems well taken, it is not necessary to decide any question of waiver involved in his failure to request severance.
[18] Sobell's counsel, it is true, did not submit a correct request to charge on the question of whether the jury could infer one or two conspiracies from Elitcher's testimony. He did, however, ask for dismissal of the indictment at the end of the Government's case on the ground that two conspiracies were proved, and, again before the charge, he objected in advance to the judge's theory, already enunciated in denying the motion for dismissal of the indictment, that if the Government's evidence was believed, one conspiracy and not two had been proved. In the circumstances, then, the writer thinks that the judge, on his own motion, should have submitted the question of one or several conspiracies to the jury.
[19] Both Supreme Court cases were decided before the federal anti-kidnapping statute passed in 1932, which would seem to forbid federal or state agents from kidnapping and transporting a defendant in foreign commerce. But see Collins v. Frisbie, 6 Cir., 189 F.2d 464, certiorari granted 342 U.S. 865, 72 S. Ct. 112, reversed 342 U.S. 519, 72 S.Ct. 509. In addition, the two Supreme Court cases involved kidnapping by state agents, and the subsequent exercise of jurisdiction by state courts over the kidnapped defendants. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, laid down the rule that a defendant in a federal criminal trial, whatever the practice in state courts, could not be convicted on the basis of confessions obtained by federal agents in violation of a federal statute. Whether or not the Court would extend the McNabb policy to cover jurisdiction of the defendant's person obtained by a federal court through the illegal acts of federal officers, we do not know.
[20] In his reply brief, Sobell says: "We do not contend, as the Government intimates that its violation of domestic or international law exempts Sobell from trial, but merely that he should be restored the choice * * * of entering the United States voluntarily or involuntarily. * * * What was violated was his right to be free from unlawful molestation or assault by his own Government; and his right not to be convicted by an `admission' wrested from him by a violent act." It seems particularly inconsistent, therefore, for Sobell not to have introduced evidence, during the trial, of his kidnapping to contradict the Government's evidence of legal deportation.
[21] Since § 794(c) covers communication "in time of war" to "the enemy," it might possibly be urged that § 794(b) was not intended to apply to acts, even in war-time, which are to "the advantage of a foreign nation" when that nation is not the nation with which this country is at war but one which, at the time, is an ally. However, the legislative history contains nothing to support such an interpretation.
[22] The information the Rosenbergs passed, they maintain, would have become known to Russia in a matter of a few years, either through disclosures of foreign research scientists who worked at Los Alamos or through research of Russian scientists.
[23] Stephan v. United States, 6 Cir., 133 F.2d 87, certiorari denied 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1148; United States v. Tomoya Kawakita, D.C.S.D. Cal., 96 F.Supp. 824, affirmed 9 Cir., 190 F.2d 506.
[24] This Court has said that where it considers a sentence unduly harsh, it will be more inclined to regard as harmful an error otherwise probably harmless. See United States v. Hoffman, 2 Cir., 137 F.2d 416; United States v. Trypuc, 2 Cir., 136 F.2d 900, 902. We have, however, found no such errors affecting the Rosenbergs.
[25] At one time the circuit courts had power to correct harsh sentences on appeal. Act of 1879, 20 Stat. 354; United States v. Wynn, C.C.E.D.Mo., 11 F. 57; Bates v. United States, C.C.N.D.Ill., 10 F. 92. The peculiar wording of the 1879 statute was omitted in conferring appellate power upon the newly created courts of appeal in 1891. 26 Stat. 826. Some courts therefore considered the 1879 law repealed by implication. Freeman v. United States, 9 Cir., 243 F. 353. But Ballew v. United States, 1895, 160 U.S. 187, 16 S.Ct. 263, 40 L.Ed. 388 and Hanley v. United States, 2 Cir., 123 F. 849, strongly suggest that the statutory powers given in the 1879 law to circuit courts had been incorporated by reference in the 1891 statute setting up the circuit courts of appeal. The fact is, however, that since 1891, federal upper courts have unswervingly denied themselves power to revise sentences on appeal.

The earliest and still most quoted federal authority rejecting the power to revise sentences on appeal is Ex parte Watkins, 7 Pet. 568, 574, 8 L.Ed. 786, where Story, J., said: "But this court has no appellate jurisdiction to revise the sentences of inferior courts in criminal cases; and cannot, even if the excess of the fine were apparent on the record, reverse the sentence." At that time, however, the Supreme Court actually had no federal criminal appellate jurisdiction over either judgments or sentences; Story's remark, therefore, has extremely limited value nowadays.
The Supreme Court reduced what it considered an excessive fine imposed on the United Mine Workers for contempt. United States v. United Mine Workers, 330 U.S. 258, 304, 67 S.Ct. 677, 91 L. Ed. 884. But there no statute authorizing particular punishment for contempt was involved; the fine was within the discretion of the trial judge, and the Supreme Court held the discretion abused. Cf. White, J., dissenting, in Weems v. United States, 217 U.S. 349, at pages 409-410, 30 S.Ct. 544, 54 L. Ed. 793.
[26] Williams v. New York, 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337. See also Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, as to the "substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution."

Radin writes that, in the Middle Ages, "Justice" popularly meant the gallows. Radin, A Juster Justice, in Legal Essays in Tribute to McMurray (1935), 537, 556. See London Times, Lit.Supp., January 4, 1952, p. 11: "It is not generally realized that down to the year 1826 the punishment of every felony in this country was death. * * *"
[27] See Commonwealth v. Garramone, 307 Pa. 507, 161 A. 733, 735, 89 A.L.R. 295; State v. Ramirez, 34 Idaho 623, 203 P. 279, 29 A.L.R. 297; Fritz v. State, 8 Okl.Cr. 342, 128 P. 170; Pittman v. State, 84 Ark. 292, 105 S.W. 874; see also Commonwealth v. Sterling, 314 Pa. 76, 170 A. 258, 259.

The courts of more than a dozen other states have not so construed identically-worded statutes. See, e. g., State v. Fowler, 59 Mont. 346, 196 P. 992, 993, 995, 197 P. 847. See A. L. I. Code of Cr.Proc. sec. 459, Commentary.
[28] The trial judge's determination of a proper sentence  no easy task  should turn on his evaluation of a host of factors, including the unique fact of the particular defendant's life, conduct and character. Where an upper court has authority to review and revise a sentence, its attempt to do so may be thwarted if the trial judge has not made public the bases of his determination (although, in some instances, a sentence may obviously be unduly harsh, no matter what the particulars of the defendant's life, etc.). In the instant case, the trial judge has publicly stated the grounds on which he based the death sentences: "Citizens of this country who betray their fellow-countrymen can be under none of the delusions about the benignity of Soviet power that they might have been prior to World War II. The nature of Russian terrorism is now self-evident. Idealism as a rationale dissolves." * * * "I consider your crime worse than murder. Plain deliberate contemplated murder is dwarfed in magnitude by comparison with the crime you have committed. In committing the act of murder, the criminal kills only his victim. The immediate family is brought to grief and when justice is meted out the chapter is closed. But in your case, I believe your conduct in putting into the hands of the Russians the A-bomb years before our best scientists predicted Russia would perfect the bomb has already caused, in my opinion, the Communist aggression in Korea, with the resultant casualties exceeding 50,000 and who knows but that millions more of innocent people may pay the price of your treason. Indeed, by your betrayal you undoubtedly have altered the course of history to the disadvantage of our country. No one can say that we do not live in a constant state of tension. We have evidence of your treachery all around us every day  for the civilian defense activities throughout the nation are aimed at preparing us for an atom bomb attack. Nor can it be said in mitigation of the offense that the power which set the conspiracy in motion and profited from it was not openly hostile to the United States at the time of the conspiracy. If this was your excuse the error of your ways in setting yourselves above our properly constituted authorities and the decision of those authorities not to share the information with Russia must now be obvious. * * * In the light of this, I can only conclude that the defendants entered into this most serious conspiracy against their country with full realization of its implications. The statute of which the defendants at the bar stand convicted is clear. I have previously stated my view that the verdict of guilty was amply justified by the evidence. In the light of the circumstances, I feel that I must pass such sentence upon the principals in this diabolical conspiracy to destroy a God-fearing nation, which will demonstrate with finality that this nation's security must remain inviolate; that traffic in military secrets, whether promoted by slavish devotion to a foreign ideology or by a desire for monetary gains must cease. The evidence indicated quite clearly that Julius Rosenberg was the prime mover in this conspiracy. However, let no mistake be made about the role which his wife, Ethel Rosenberg, played in this conspiracy. Instead of deterring him from pursuing his ignoble cause, she encouraged and assisted the cause. She was a mature woman  almost three years old than her husband and almost seven years older than her younger brother. She was a full-fledged partner in this crime. Indeed the defendants Julius and Ethel Rosenberg placed their devotion to their cause above their own personal safety and were conscious that they were sacrificing their own children, should their misdeeds be detected  all of which did not deter them from pursuing their course. Love for their cause dominated their lives  it was even greater than their love for their children."

A few minutes before, during defense counsel's remarks prior to sentencing, the judge said: "You overlooked one very salient feature, and that is that their activities didn't cease in 1945, but that there was evidence in the case of continued activity in espionage right on down, even during a period dealing with a hostile nation."
On sentencing Greenglass to fifteen years' imprisonment, the judge said: "The fact that I am about to show you some consideration does not mean that I condone your acts or that I minimize them in any respect. They were loathsome; they were contemptible. I must, however, recognize the help given by you in apprehending and bringing to justice the arch criminals in this nefarious scheme, Julius Rosenberg and his wife, Ethel Rosenberg. You have at least not added to your sins by committing the additional crime of perjury. You confessed and told a complete story in this case and it has been of great assistance to the Government. I realize the courage that was required for you to give your testimony, and I must say that you were the recipient of the best kind of legal advice in doing so. It is obvious that the Government gave due consideration to your assistance in their recommendation. I have to be realistic in a situation such as this, and I recognize that despite my own inclination to be more severe on your sentence, due to the revolting nature of this offense, I must subordinate my own feeling. Our national security is more important than any personal feeling that I might have on the subject, and it is indeed more important, I think, than the punishment of any single individual; and by your assistance in this case you have helped us strike a death blow to the trafficking in our military secrets, to the advantage of a foreign nation."
[29] The reluctance of upper courts to interfere with the sentencing process may perhaps, at least in part, be due to the existence of the executive's pardoning power, and in part to a desire not to engage in a most difficult undertaking. That process calls for training and specialized knowledge of a kind which the education of few judges provides. See Page, The Sentence of the Court (1948), which treats of the English judiciary, but seems substantially applicable to ours. Page points out that among English judges it "could scarcely be claimed that * * * there is any agreed and commonly accepted principle guiding their selection of punishment," and quotes Mr. Justice McCardle who said: "Anyone can try a case. That is as easy as falling off a log. The difficulty comes in knowing what to do with a man once he has been found guilty." However, as noted above, it is arguable that the difficulty makes it the more desirable that upper courts be able to review and modify sentences.
[30] Where an upper court has such power, the criterion used to determine whether a sentence is too harsh would seem to be that court's own judgment  not the "common conscience."

It has been held that, in such circumstances, the upper court may consider, for such purposes, the quality of the evidence on which the verdict rests. See Fritz v. State, 8 Okl.Cr. 342, 128 P. 170. So here, had this court such power, it might take into consideration the fact that the evidence of the Rosenbergs' activities after Germany's defeat (as well as of their earlier espionage activities) came almost entirely from accomplices.
[31] See, however, Schultz v. Zerbst, 10 Cir., 73 F.2d 668, 670; Moore v. Aderhold, 10 Cir., 108 F.2d 729, 732; Dryden v. United States, 8 Cir., 139 F.2d 487, 488; United States v. Sorcey, 7 Cir., 151 F.2d 899, 902-903. These cases say that a sentence authorized by statute usually will not be cruel and unusual punishment, but are not altogether clear as to whether a sentence may be such, even if the statute is not. In this respect, see Mr. Justice Field, dissenting, in O'Neil v. Vermont, 144 U.S. 323, 340, 12 S.Ct. 693, 700, 36 L.Ed. 450: "It is no matter that by cumulative offenses, for each of which imprisonment may be lawfully imposed for a short time, the period prescribed by the sentence was reached, the punishment was greatly beyond anything required by any humane law for the offenses."

Cf. In re Kemmler, 136 U.S. 436, 446, 10 S.Ct. 930, 933, 34 L.Ed. 519, quoted in State of Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, footnote 4, 67 S.Ct. 374, 376, 91 L.Ed. 422: "* * * but the language in question, as used in the constitution of the State of New York was intended particularly to operate upon the legislature of the state, to whose control the punishment of crime was almost wholly confided." Cf. Story, Commentaries on the Constitution, S. 1903: "* * * the provision would seem to be wholly unnecessary in a free government, since it is scarcely possible that any department of such a government should authorize or justify such atrocious conduct. * * *" The inhibition is "directed * * * against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." Field, J., in O'Neil v. Vermont, supra, 144 U. S. 339-340, 12 S.Ct. 699.
In State of Louisiana ex rel. Francis v. Resweber, supra, the Court considered whether an electrocution, after a first attempt to electrocute had failed for mechanical reasons, would be so cruel and unusual as to violate the due process clause, even if authorized by the Louisiana statute. In Johnson v. Dye, 3 Cir., 175 F.2d 250, 256, reversed on other grounds, 338 U.S. 864, 70 S.Ct. 146, 94 L.Ed. 530, the court called the treatment of Georgia chain-gang prisoners "cruel and unusual punishment" and so a violation of the due process clause of the Fourteenth Amendment. Perhaps it can be said that that treatment was so common in Georgia as to have become part of the penalties prescribed by the statute. See also Kenimer v. State ex rel. Webb, 81 Ga.App. 437, 59 S.E.2d 296.
[32] United States ex rel. Bongiorno v. Ragen, D.C.N.D.Ill., 54 F.Supp. 973, affirmed 7 Cir., 146 F.2d 349. Perhaps this is but an elliptical way of saying that, if the statute permitted such a sentence, the statute would be unconstitutional, and therefore the statute should be so interpreted as to preclude that sort of sentence.
[33] Id.

The test may have been derived from the language of some Supreme Court decisions: "Taking human life by unnecessarily cruel means shocks the most fundamental instincts of civilized man"; State of Louisiana ex rel. Francis v. Resweber, supra, 329 U.S. at page 473, 67 S.Ct. at page 381, Burton dissenting: "* * * a punishment at the severity of which, considering the offenses, it is hard to believe that any man of right feeling and heart can refrain from shuddering"; O'Neil v. Vermont, 144 U.S. 333, 340, 12 S.Ct. 693, 700, 36 L.Ed. 450. "* * * the judgment of mankind would be that the punishment was not only an unusual, but a cruel, one, and a cry of horror would rise from every civilized and Christian community of the country against it." Id.
[34] See note 30, supra.
[35] See Cahn, Authority and Responsibility, 51 Col.L.Rev. (1951) 838. Cahn's thesis suggests that a trial judge, in fixing a sentence, ought  after examining external data, including especially professional judgments in like cases  to rely on his own internal valuation and should not use the "common conscience" as a "scape-goat." See also Gray, The Nature and Sources of Law (2d Ed. 1921), 287ff.
[36] Cf. Schmidt v. United States, 2 Cir., 177 F.2d 450, 451-452.
[37] Cf. Johnson v. United States, 2 Cir., 186 F.2d 588, 590.
[38] Cf. Roth v. Goldman, 2 Cir., 172 F.2d 788, 796, concurring opinion.
[39] The situation is not like that which exists when an upper court has authority to modify a sentence which is within the limits of a valid statute. See note 24, supra.
[40] Cf. Howard v. Fleming, 191 U.S. 126, 135-136, 24 S.Ct. 49, 48 L.Ed. 121; Collins v. Johnston, 237 U.S. 502, 510, 35 S.Ct. 649, 59 L.Ed. 1071.
[41] A sentence, although not "cruel and unusual," may violate the due process clause. Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690. There the Court held invalid a sentence imposed because of the trial judge's mistaken belief that the defendant was guilty of other crimes, and in a case where defendant was not represented by counsel. There is nothing equivalent here.

The Rosenbergs, of course, may ask the Supreme Court, considering 28 U.S.C. § 2106, to over-rule the decisions precluding federal appellate modification of a sentence not exceeding the maximum fixed by a valid statute, and to direct us accordingly to consider whether or not these sentences are excessive; or the Rosenbergs, pursuant to Federal Rule of Criminal Procedure 35, may move the trial judge for a reduction of their sentences; or, if those alternatives fail, these defendants may seek relief from the President. See Biddle v. Perovich, 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161.
[1] Cf. our analogous holding in United States v. Remington, 2 Cir., 191 F.2d 246, with reference to the similar two-witness (or one corroborated witness) rule applicable to proof of an overt act in a perjury trial.
[2] Hurst commented: "On the other hand, where the defendant is charged with conduct involving all the elements of treason within the constitutional definition, and the gravamen of the accusation against him is an effort to subvert the government, or aid its enemies, it would seem in disregard of the policy of the Constitution to permit him to be tried under another charge than `treason.' However, the decision in Ex parte Quirin casts considerable doubt on the validity of this analysis."

After quoting that passage from that opinion which we have quoted above in the text, Hurst continued: "The decisions cited as analogies by the Court are the now standard authorities holding that the double jeopardy clause of the Constitution is not violated by conviction for two or more offenses which are in substance part of the same criminal transaction, but which involve different elements in the allegation. It is not a convincing technique of interpretation to apply to a constitutional guaranty having its own history of policy a formal test developed under a different clause of the Constitution, with no demonstration that the policies behind the respective clauses are so similar as to be fulfilled by the same criterion. The double jeopardy clause is historically a guaranty against abuse of the law enforcement machinery as such, without reference to abuses peculiar to any one of the major types of crime. When the Constitution singles out the offense of treason as subject to special abuse, citation of a highly technical rule developed by judicial construction out of the general guaranty is in itself little evidence that the peculiar dangers against which the special guaranty was erected have been avoided. Though the type of offense charged against the American citizen in the saboteur group is a very clear case of treason, it is also within the category of charge the abuse of which was feared by the framers. The `absence of uniform' noted as the essentially distinct element of the offense under the law of war made the defendant's conduct more dangerous simply because it enabled him to appear as what he was  one of the body of citizens. And it was citizens that the limitations of the treason clause were intended to protect."
[3] The defendants suggest that the Quirin decision, because it involved an appeal from a military tribunal of a conviction for an offense against the laws of war, "was based alone on a resolution of the conflict of the jurisdiction of military and civil authority." We do not read the opinion that way. See Hurst, supra, at 422, note 135.
[4] See Hurst, supra, at 423: "There is the possibility that Congress might be restrained by the constitutional ban on cruel or unusual punishments from imposing the highest penalties for certain conduct, unless it were held to mount to the level of treason." In a footnote, Hurst adds: "A penalty may be `cruel and unusual' because unreasonably disproportionate to the offense. Weems v. United States, 1910, 217 U.S. 349 [30 S.Ct. 544, 54 L.Ed. 793]; see Chambers v. Florida, 1940, 309 U.S. 227, 236 [60 S.Ct. 472, 84 L.Ed. 716]. The contention that severe penalties possible under sedition acts are so disproportionate as to violate the Eighth Amendment has not met with success, and it seems that no legislative excess short of including capital punishment would run afoul of this provision. Cf. Dunne v. United States, 8 Cir.1943, 138 F.2d 137, 140, cert[iorari] den[ied] 320 U.S. 790 [64 S.Ct. 205, 88 L.Ed. 476]; Chafee, Free Speech in the United States (1941) 480. But cf. Herndon v. Lowry, 1937, 301 U.S. 242 [57 S. Ct. 732, 81 L.Ed. 1066]; Chafee, op. cit. 396. See 1 Schofield, Essays on Constitutional Law and Equity (1921) 421."